IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

# FILED

JUN 1 2 2017

KATE BARKMAN, Clerk

By_____Dep. Clerk

TROY LAMONT MOORE, JR.

            Plaintiff

Civil Action Number 14-3873

      v.

CORRECTIONS OFFICER  Saajida  Walton

            Defendant

MOTION FOR SUMMARY JUDGMENT


   Pursuant to Federal Rule of Civil Procedure 56, plaintiff as Counsel of Record hereby move the Court for summmary judgment. Which is for plaintiff's claim of Conditions of Confinement on grounds that there is a genuine issue of material fact in dispute and Moore is entitled to judgment as a matter of law. The United States Supreme Court has dealt with inmates conditions of confinement in a number of cases. These cases that will be cited establish that for convicted inmates, the Cruel and Unusual Punishment Clause of the Eighth Amendment imposes a duty on prison officials to provide "humane conditions of confinement."

   A brief in support of this motion with a statement of disputed material facts and supporting documents will be filed contemporaneously with this motion.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANI

TROY LAMONT MOORE, JR.,                    :   Civil Actiion Number 14-3873
        Plaintifff

        v.                                     **FILED**

CORRECTIONS OFFICERS Saajida Walton
        Defendant                          JUN 1 2 2017

                                           KATE BARKMAN, Clerk
                                           By_____Dep. Clerk

RELIEF OF SOUGHT

WHEREFORE, Plaintiff, Troy L. Moore seeks for reief against Defendant Corrections Officer Saajida Walton in Compensatory Damages in the amount of $200,000 & Punitive Damages in the amount of $300,000.

CERTIFICATE OF SERVICE

I, Troy L. Moore, hereby certify that on 06-07-17   caused to be served a true and correct copy of the foregoing document titled Motion for Judgment to the following:

VIA U.S. MAIL:
Defendants Attorney Below...

                                           RESPECTFULLY SUBMITTED,

                                           Troy L. Moore

BROCK ATKINS                               ####### MX-9664
DIVISIONAL DEPUTY CITY SOLICITOR           SCI-Forest 945
CITY OF PHILADELPHIA LAW DEPT.             P.O. Box 945
1515 ARCH STREET 14TH FLOOR                Marienville, Pa 16239
PHILA, PA. 19102-1595

-2-

3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TROY LAMONT MOORE, SR.,                          :

            Plaintiff                            :      Civil Action Number   14-3873

    v.

CORRECTIONAL OFFICER Saajida Walton

            Defendant

STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. Rule 56 (C)(1)(A)(B), Plaintiff Troy Moore as Counsel of Record as pro-se submits the following statement of undisputed material facts  for purposes of summary judgment only:

1. On September 116,2013, plaintiff Moore was incarcerated at Industrial Correctional Center. 8301 State Road. Philadelphia, Pa 19136. At approximately 2315 hours, the toilet violently over flowed every 20 minutes through out the night with feces and urine. After experiencing shortness of breath & chest pains along with vomiting. Plaintiff reported it to corrections officer S. Walton who ignored his request to remove him out of cell 18 and requested medical attention. After being covered in and subjected to breathing raw sewage in access of 8 hours. Plaintiff was permitted to go to medical where he informed Rn. Mogrogan of chest pain. Plaintiff pulse was taken and he was ordered back to the unit to go in cell 18. See, Documents[1] of maintenance repair reports by Mr. Lewis for plaintiff's assigned cell 18. See, N.T. Depositiion[2] of plaintiff's testimony taken by defendants on Febraury 2, 2015 at 15-25 & declaration[3] by plaintiff.

Additionally, summary judgment will be precluded only, once the dispute about a material fact is, "geniune" that is, once the evidence is such that a reasonable jury would return a verdict for the nonmoving party. Id. See, Scicluna v. Well,  345 F.3d 441, 445 (6th Cir, 2003).

1. Plaintiff attached as evidence Exhibit 1, Exhibit 2 & Exhibit 3 to support undisputed material facts.
2. Plaintiff attached as evidence Exhibit 2 of deposition to support undisputed material facts.
3. Plaintiff attached as evidence Exhibit 3 of his declaration to support undisputed material facts for a jury to decide.

-1-

Moore V. Saajida Walton    -cv- 14-3873

STATEMENT OF UNDISPUTED MATERIAL FACTS FOR A JURY TO DECIDE.

There is a genuine issue of undisputed material facts in the constitutional violation caused to plaintiff by defendant S. Walton. Which was by not removing plaintiff Moore from assigned cell 18 on "G" unit being exposed to feces & unrine for in access of 8 hours. Atfer experiencing shortness of breath & chest pain along with vomiting.and full body rash.

A[n individual government] defendant in a civil rights action must have personal involvement as like defendant S. Walton in the alleged wrongdoing. Which was for failing to removed plaintiff Moore from cell 18 as requested. Liability can be predicated on S. Walton personal involvement of plaintiff being exposed to feces & urine causing shortness of breath along with chest pains and vomiting. The Third Circuit has held that civil rights complaint is adequate where it states the conduct, time, place & person responsilbe as like S. Walton. See, Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). See, Evancho v. Fisher, 845 F.3d 347, 353 (3d Cir. 2005).

FILED

JUN 12 2017

SOUGHT OF RELIEF

KATE BARKMAN, Clerk
By_____Dep. Clerk

WHEREFORE,  Plaintiff seeks relief against  Defendant Corrections Officer S. Walton in Compensatory Damages in the of $200,000 & Punitive Damages in the amount of $300,000.

CERTIFICATE OF SERVICE

I, Troy Moore, hereby certfiy that on 06-07-17 , I caused to be served a true and correct copy of the foregoing document titled Statement of Undisputed Material Facts in Support Documents, Deposition & Declaration for Motion for Summary Judgment to the following:

RESPECTFULLY SUBMITTED,

Defendant Attorney :

Troy Moore

BROCK ATKINS
DIVISIONAL DEPUTY CITY SOLICITOR
CITY OF PHILADELPHIA LAW DEPT.
1515 ARCH STREET 14TH FLOOR
PHILA, PA. 19102-1595

####### MX-9664
SCI-Forest
P.O. BOX 945
 MARIENVILLE, PA 16239

-2-

5

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNYLVANIA

TROY LAMONT MOORE, JR.,                                    :

          Plaintiff                               :   Civil Action Number 14-3873

     v.

CORRECTIONS OFFICER Saajida Walton

       Defendant


BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff. Troy Moore filed a lawsuit against Correctiional Officer S. Walton for violating his Constitutional Rights under the Eighth Amendment. Which is for plaintiff's Claim of "Conditions of Confinement" on grounds that there is a genuine isue of material fact in dispute. And Moore is entitled to judgment as matter of law The United States Supreme Court hasdealth with inmates conditions of confinement in a number of cases. These cases that will be cited established that for convicted inmates, the "Cruel and Unusual Punishment Clause" of the Eighth Amendment imposes a duty on prison officials to provide humane conditiions of confinement.

ARGUMENT & FACTS:

A.

Purusant to Fed.R.Civ.P. Rule 56 (c)(1)(A)(B), plaintiff submits the following statement of undisputed material facts for purposes of summary judgment only:

On September 1 6 ,2013, plaintiff Moore was incarcerated at Industrial Correctionl Center. 8301 State Road. Philadelphia, Pa 19136. At approximately 2315 hours, the toilet violently flowed every 20 minutes through out the night with feces and urine. After experiencing shortness of breath & chest pains along with vomiting. Plaintiff reported it to defendant S. Walton who ignored his request to remove him out of cell 18 and requested medical attention. After being ciovered in and subjected to breathing raw sewage in access of 8 hours. Plaintiff permitted to go to medical where he informed Rn. Mogrogan of chest pain. Plaintiff pulse was taken and he was ordered ba ck to cell 18. See, Documents[1] of maintenance repair reports by Mr. Lewis of plaintiff's assigned cell 18. See, N.T. Deposition[2] of plaintiff's taken by defendants on February 2, 2015 at 15-25 & declaration by plaintiff.

1. Plaintiff attached as evidence Exhibit 1, Exhibit 2 & Exhibit 3 to support undisputed material facts.

2. Plaintiff attached as evidence Exhibit 2 of deposition to support undisputed material facts.

3. Plaintiff attached as evidence Exhibit 3 of his declaration to support undisputed material facts for a jury to decide.

1

10

Moore V. Saajida Walton          -cv-14-3873

B.                              STATEMENT OF UNDISPUTED MATERIAL FACTS FOR A JURY TO DECIDE

There is a genuine issue of undisputed material facts in the constitutiional violation caused to plaintiff by defendant S. Walton. Plaintiff will call his witness a staff named Mr. Kohenklien[1] , a maintenance person that fixed plaintiff's assigned cell 18 on 9/17/2013 to testify before a jury about the flood in  cell 18 of feces & urine. The witness Kohenklien will also testify about the fact that plaintiff washed down cell 18 with bleach & floors being washed & dryed. Plaintiff's statement of undisputed material facts is for a jury to decide. Plaintiff will obtain subpoenas for his witnesses to testify. See, Scicluna v. Wells, 345 F.3d 441, 445 (6th Cir. 2003)

Summary judgment is appropriate "where the pleadings, depositions, answers to interrogatories, admissions and affidavits show there is genuine issue of material fact and the non-moving party is entitled to judgment as a matter of law.

Summary Judgment will be considered once the dispute about a material fact is "genuine" once the evidence is such that a reasonable jury would return a verdict for the nonmoving party. See, Wilson v. Williams, 997 F.2d 348, 350-51 (7th Cir. 1993). See, Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004).

As to factual dispute that are relevant or necessary that must go forward for summary judgment for a jury to decide. Plaintiff as a pro-se litigant has shown as evidence of his testimony at depostion and declaration[2] along with documents[3] showing that there is a genuine issue of material facts for a trial for a jury to decide. See. Fed.Rules.Civ.P, Rule 56 (c)(1)(A)(B) & Fed. Rules. Civ.P. rule 56 (e). See, Jones v. Blanas, 393 F.3d (9th Cir. 2004)(holding that here plaintiff is pro-se, the Court must consider as evidence in his opposition to summary judgment all of [plaintiff's] contentions offered in his motion & pleadings. Where such contentions are based on personal knowledge and set forth that would be admissible in evidence. And where [plaintiff] attested under penalty of perjury that contents of the motion or pleadings are true and correct.

1. Plaintiff attached as evidence Exhibit 2 to support undisputed material facts.

2. Plaintiff attached as evidence Exhibit 3 of his declaration to support undisputed facts for a jury to decide.

3.  Plaintiff attached as evidence deposition of plaintiff dated Febraury 2, 2015 taken by defendants.

-2-

7

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
Civil Actiion Number 14-3873

A[n individual government] defendant in a civil action rights action must have personal involvement as like defendant S. Walton in the alleged wrongdoing. Which was on September 16 2013 at approprximately 2315 hours. The plaintiff Moore assigned cell 18 toilet violently flowed every 20 minutes through out the night with feces and urine on the floor.  After experiencing shortness of breath & chest pains along with vomiting. Plaintiff reported it to defendant S. Walton a female correctional officer who ignored his request to remove him from cell 18 and requested medical attention.  Liability can be predicated on defendant S. Walton's personal involvement. See, Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d cir. 1988). The Third Circuit has held that civil rights complaint is adequate where it states the conduct, time, place and person respsponible as Walton. See, Evancho v. Fisher, F.3d 347, 353 (3d cir. 2005).

SOUGHT OF RELIEF

I, WHEREFORE, Plaintiff, Troy L. Moore, seeks for relief against Defendant Saajida Walton Correctiional Officer in Compensatory Damages in teh amount of $ 200,000 & Punitive Daages in the amount of $300,000. Plaintiff is will to settle his claim for $50,000.

CERTIFICATE OF SERVICE

I, Troy L. Moore, hereby certify that on 06-07-17, I caused to be served a true and correct copy Brief to support his Motion for Summary Judgment to the following:

VIA U. S. MAIL:

Defendant Attorney below:
SUBMITTED,

BROCK ATKINS
DIVISIONAL DEPUTY CITY SOLICITOR
CITY OF PHILADELPHIA LAW DEPT.
1515 ARCH STREET 14TH FLOOR
PHILA, PA. 19102-1595

16239

RESPECTFULLY

Troy L. Moore
~~#ILE#2##8#~~ MX-9664
SCI-Forest
P.O. Box 945
Marienville, Pa

-3-

8

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


TROY LAMONT MOORE, JR.,                    :    Civil Action No. 14-3873

        Plaintiff

    v.

CORRECTIONS OFFICER Saajida Walton

       Defendant

EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT


Documents as......................................................................................Exhibit 1

Documents as......................................................................................Exhibit 2

Documents as......................................................................................Exhibit 3

Plaintiff's Deposition as......................................................................Exhibit 3

Plaintiff's Declaration as.....................................................................Exhibit 2


SUBMITTED,                                              RESPECTFULLY

                                                        Troy Moore

                                                      ~~#######~~ MX-9664

                                                      SCI-Forest

                                                      P.O. Box 945

                                                     Marienville, Pa

16239

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TROY LAMONTMOORE,                          :

        Plaintiff                          :         Civil Actiion Number   14-3873

   v.

CORRECTIONS OFFICER Saajida Walton

        Defendant

ORDER

AND NOW,_____,DAY OF _____2016 UPON CONSIDERATION OF PLAINTIFF"S

MOTIION FOR SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF"S, IT IS HEREBY ORDERED THAT THE MOTION BE
GRANTED.

BY THE COURT:

_____

EDUARDO C. ROBRENO, J.

*Exhibit 1*

```
                    NOTE: C/O SUBER ON G-2 WITH TO IM WORKERS DROPPING OFF COURT
meal
09/17/2013 04:23 MEAL                              WALTON_S
                    MEAL CALL
                    COURT MEAL IN  PROGRESS *********************************
09/17/2013 04:44 OKTOUR                            WALTON_S
                    TOURED UNIT: APPEARS IN ORDER
                    TOUR MADE ALL APPEARS IN ORDER ******************************
09/17/2013 04:45 OTHER                             WALTON_S
                    OTHER EVENT
                    NOTE: C/O BOSTON ESCORTED COURTS TO R/R G-2 ****************
09/17/2013 04:49 RELEAS                            WALTON_S
                    INMATE RELEASED FROM UNIT
          560861   HINTON, ROBERT
                    -1HINTON ROBERT CELL 10 PAYOFF HOUSE ARREST FROM G-2 TO R/R*
09/17/2013 04:50 CENSUS                            WALTON_S
                    CENSUS AND HEADCOUNT
                    NEW CENSUS IS 97 ******************** 97 *****************
09/17/2013 04:50 CENSUS                            WALTON_S
                    CENSUS AND HEADCOUNT
                    CENSUS 97 AND H/C 89 ***************** 8COURTS ***********
09/17/2013 05:21 OKTOUR                            WALTON_S
                    TOURED UNIT: APPEARS IN ORDER
                    TOUR MADE ALL APPEARS IN ORDER ******************************
09/17/2013 06:13 OKTOUR                            WALTON_S
                    TOURED UNIT: APPEARS IN ORDER
                    TOUR MADE ALL APPEARS IN ORDER ******************************
09/17/2013 06:32 OTHER                             WALTON_S
                    OTHER EVENT
          838689   VALDEZ, EDWIN
                    NOTE: C/O BOSTON IS ESCORTING I/M VALDEZ EDWIN BACK TO G-1**
09/17/2013 06:49 OKTOUR                            WALTON_S
                    TOURED UNIT: APPEARS IN ORDER
                    FINAL TOUR MADE ALL APPEARS IN ORDER ********************
09/17/2013 06:50 OTHER                             WALTON_S
                    OTHER EVENT
                    NOTE: KEYS WAS TURNED IN TO AUX 5 OFFICER ROBERSON*********
09/17/2013 06:51 CENSUS                            WALTON_S
                    CENSUS AND HEADCOUNT
                    CLOSING CENSUS IS 97 AND H/C 89*********** 8 COURTS ********
09/17/2013 06:52 OTHER                             WALTON_S
                    OTHER EVENT
                    CELL 14 SINK IS CLOGGED *********************************
09/17/2013 06:53 OTHER                             WALTON_S
                    OTHER EVENT
                    NOTE: CELLS 18 AND 19 TOILETS O ARE OVER FLOODING *********
09/17/2013 06:56 OTHER                             WALTON_S
                    OTHER EVENT
                    NOTE: WALKIE WAS TURNED IN TO AUX 5 OFFICER C/O ROBERSOMN***
09/17/2013 07:01 SIGNOF                            WALTON_S
                    SIGNOFF DUTY
                    C/O WALTON OFF DUTY ******************************************
09/17/2013 07:05 SIGNON                            HULL_TI
                    SIGNON DUTY
                    C/O T.HULL ON DUTY
09/17/2013 07:05 OKTOUR                            HULL_TI
                    TOURED UNIT: APPEARS IN ORDER
                    17-SEP-2013 07:05:15.40
09/17/2013 07:09 SIGNON                            CAPORALE_S
                    SIGNON DUTY
```

EXHIBIT
2

```
                 C/O CAPORALE ON DUTY, RECEIVED ONE KEY. *******************
09/17/2013 07:10 ECHECK                              CAPORALE_S
                 EQUIPMENT CHECK
                 POST ORDERS,LOGBOOK,PHONE,WALKIE,2 EXTGS.,SEC.CUT DOWN KIT.
09/17/2013 07:11 CENSUS                              CAPORALE_S
                 CENSUS AND HEADCOUNT
                 STARTING CENSUS 97 ****** HEADCOUNT 89 ****** COURT 8 ******
09/17/2013 07:11 OTHER                               CAPORALE_S
                 OTHER EVENT
                 NOTIFIED C/C AND AUX 5 WITH COUNTS. ***********************
09/17/2013 07:12 OTHER                               CAPORALE_S
                 OTHER EVENT
                 NOTE: CELL#14 SINK CLOGGED & CELL#18&19 TOILET OVERFLOWING.
09/17/2013 07:22 OTHER                               CAPORALE_S
                 OTHER EVENT
                 NOTIFIED MAINTENANCE, MR. LEWIS OF SINK & TOILET PROBLEMS.
09/17/2013 07:24 CENSUS                              CAPORALE_S
                 CENSUS AND HEADCOUNT
                 PER C/C CENSUS & HEADCOUNT CENSUS & HEADCOUNT CLEARED. *****
09/17/2013 07:48 OKTOUR                              CAPORALE_S
                 TOURED UNIT: APPEARS IN ORDER
                 UNIT TOURED, ALL APPEARS IN ORDER AT THIS TIME. ************
09/17/2013 07:51 OTHER                               CAPORALE_S
                 OTHER EVENT
                 MAINT. MR. LEWIS SENDING WORKERS FOR CELL#14, 18 & 19. *****
09/17/2013 07:59 OTHER                               CAPORALE_S
                 OTHER EVENT
                 PER C/C ALL YARDS ARE CLEAR AT THIS TIME. *****************
09/17/2013 08:07 OTHER                               CAPORALE_S
                 OTHER EVENT
                 PER CAPTAIN BATTESTELLI UNIT G2 IS DOWN AT THIS TIME. ******
09/17/2013 08:08 FOOD                                CAPORALE_S
                 FOOD CART ARRIVED
                 99 TRAYS, 7 LOAVES OF BREAD, BUTTER, & JUICE ON UNIT. ******
09/17/2013 08:13 MEAL                                CAPORALE_S
                 MEAL CALL
                 MEAL BEING SERVED IN CELLS AT THIS TIME. *******************
09/17/2013 08:24 MEAL                                CAPORALE_S
                 MEAL CALL
                 MEAL COMPLETED AT THIS TIME. ******************************
09/17/2013 08:24 OKTOUR                              CAPORALE_S
                 TOURED UNIT: APPEARS IN ORDER
                 UNIT TOURED DURING FEED IN ALL APPEARS IN ORDER. ***********
09/17/2013 08:30 MEDICA                              HULL_TI
                 MEDICATION EVENT
                 MEDICATION CALL
09/17/2013 08:35 MEDICA                              CAPORALE_S
                 MEDICATION EVENT
                 4 I/M'S REFUSED:F WATSON#13, T SMITH#40, T MOORE#18, AND
R Middleton #19.«
09/17/2013 08:41 MEDICA                              CAPORALE_S
                 MEDICATION EVENT
                 MEDICATION IN PROGRESS. ***********************************
09/17/2013 08:44 OTHER                               CAPORALE_S
                 OTHER EVENT
                 MAJOR MAY ON TOUR OF AREA AT THIS TIME. *******************
09/17/2013 08:49 SIGNOF                              HULL_TI
                 SIGNOFF DUTY
                 C/O TI HULL DETAILED TO BUNIT AT THIS TIME. ***************
09/17/2013 08:51 MEDICA                              CAPORALE_S
```

*Ex/H/B/T/*

*3*

```
          MEDICATION EVENT
          MEDICATION NOW TERMINATED. ********************************
09/17/2013 09:11 OTHER                              CAPORALE_S
          OTHER EVENT
     899660   SAMS, STANLEY
          PLATO & GED PROGRAMS NOW IN PROGRESS: I/M S SAMS TO PLATO
09/17/2013 09:13 OTHER                              CAPORALE_S
          OTHER EVENT
          3 I/M'S TO MS THOMPSON, SOC. WKR: A CUNNINGHAM #978345, WM.
  Mallory #988726 and C. Williams #956850.
09/17/2013 09:30 OTHER                              CAPORALE_S
          OTHER EVENT
          3 I/M'S TO MENTAL HEALTH PER MR. EFFA; A TEJEDA #1025994,
  Billae Lewis #895814 and Willima Evans #741331
09/17/2013 09:46 OKTOUR                             CAPORALE_S
          TOURED UNIT: APPEARS IN ORDER
          UNIT TOURED, ALL APPEARS IN ORDER *************************
09/17/2013 09:46 OTHER                              CAPORALE_S
          OTHER EVENT
          MAINT., MR KOHENKLEIN ON UNIT FOR FLOOD IN 18 & 19 CELLS ***
09/17/2013 10:03 OTHER                              CAPORALE_S
          OTHER EVENT
     1111807   BASEMY, GABRIEL
          I/M GABRIEL BASEMY SENT TO GED TO TUTOR ********************
09/17/2013 10:23 SUPVTO                             WOOD_T
          SUPERVISOR'S TOUR
          SGT.WOOD IN AREA ON TOUR
09/17/2013 10:56 OTHER                              CAPORALE_S
          OTHER EVENT
          CELLS #14,18 & 19 FIXED BY MR. KOHENKLEIN, CELLS 18 & 19
  being washed down by bleach and floors being washed & dryed. *******
09/17/2013 10:57 OKTOUR                             CAPORALE_S
          TOURED UNIT: APPEARS IN ORDER
          UNIT TOURED, ALL APPEARS IN ORDER AT THIS TIME *************
09/17/2013 11:01 OTHER                              CAPORALE_S
          OTHER EVENT
          3 I/M'S RETURNED FROM MENTAL HEALTH. ********************
09/17/2013 11:02 OTHER                              CAPORALE_S
          OTHER EVENT
          3 I/M'S RETURNED FROM SOCIAL WORKERS OFFICE. ***************
09/17/2013 11:03 OTHER                              CAPORALE_S
          OTHER EVENT
     899660   SAMS, STANLEY
          1 I/M RETURNED FROM PLATO (S. SAMS) ***********************
09/17/2013 11:03 SICK                               CAPORALE_S
          SICK CALL
          SICK CALL IN PROGRESS 10:20 TERMINATED 10:35. *************
09/17/2013 11:07 OTHER                              CAPORALE_S
          OTHER EVENT
          I/M'S SENT TO VISITS: J FERNANDEZ #1082145, B LEWIS #895814
  and S. Davis #776222
09/17/2013 11:14 OTHER                              CAPORALE_S
          OTHER EVENT
          TOILET TISSUE DISTRIBUTED TO EACH CELL AT THIS TIME. *******
09/17/2013 11:23 OTHER                              CAPORALE_S
          OTHER EVENT
     1111807   BASEMY, GABRIEL
          I/M G. BASEMY RETURNED FROM GED CLASS *********************
09/17/2013 11:29 SIGNON                             KHAN_A
          SIGNON DUTY
```

TROY LAMONT MOORE, SR.

10

1  Q.  Do you have any education beyond your
2  associates degree?
3  A.  No.
4  Q.  Did you have -- do you have any formal
5  training after 2006, formal education?
6  A.  Some education with Chevrolet.
7  Q.  What did you do with Chevrolet?
8  A.  I was a consultant and sales agent for two
9  major dealerships in Houston.
10  Q.  When was that?
11  A.  2011 to 2012.
12  Q.  Are you married?
13  A.  No, I am not.
14  Q.  Do you have any children?
15  A.  Two.
16  Q.  What was your last employment prior to
17  being incarcerated?
18  A.  I was a shift supervisor for an oil
19  refinery in North Philadelphia.
20  Q.  What was -- who was your employer?
21  A.  Neats Foot Oil Refinery.
22  Q.  Can you spell that?
23  A.  N-E-A-T-S, F-O-O-T, Oil Refinery.
24  Q.  And can you give me your dates of

11

1  employment at the oil refinery?
2  A.  I believe January of 2013 to July of 2013.
3  Q.  You were employed by the oil refinery when
4  you were arrested?
5  A.  I just had resigned a week before.
6  Q.  I want to talk to you a little bit about
7  your criminal history.  My understanding is you were
8  convicted of robbery in 2002 --
9  A.  Correct.
10  Q.  -- is that correct?
11  A.  Yes.
12  Q.  How many years did you serve for that
13  conviction?
14  A.  Nine years, nine months, 26 days, 23 hours,
15  15 minutes, 20 seconds.
16  Q.  When were you released?
17  A.  I was released -- actually, I left the
18  state system on prerelease in 2011.
19  Q.  Where did you serve the majority of your
20  time for the 2002 conviction?
21  A.  At SCI Rockview.
22  Q.  How long did you spend at Rockview?
23  A.  Roughly seven and a half years.
24  Q.  And you were arrested again in 2013; is

12

1  that correct?
2  A.  That is correct.
3  Q.  And you pled guilty to robbery in 2014; is
4  that correct?
5  A.  Yes, sir.
6  Q.  And you're currently serving a 10 to 20
7  year sentence for that conviction?
8  A.  Yes, sir.
9  Q.  Have you been convicted of any other crimes
10  that we haven't talked about?
11  A.  No, just the robbery.
12  Q.  I want to talk to you to a little bit about
13  your medical history.
14    Do you -- did you have any health issues
15  prior to September 16th, 2013?
16  A.  Yes.
17  Q.  What kind of health issues did you suffer
18  from?
19  A.  I have a lower lumbar disability, which is
20  mainly handled through the VA, Veterans
21  Administration.  I have CAD, which is coronary
22  artery disease, which I am prescribed and take
23  Nitrostat Tabs PRN.  And also I have PTSD.
24  Q.  When were you first diagnosed with your

13

1  lower lumbar disability?
2  A.  My best estimation would be '97.
3  Q.  And you've suffered with lower lumbar
4  issues ever since?
5  A.  Correct.
6  Q.  When were you first diagnosed with coronary
7  artery disease?
8  A.  I would say '98.
9  Q.  And have you continued to suffer from
10  coronary artery disease since 1998?
11  A.  Yes.
12  Q.  When were you diagnosed with PTSD?
13  A.  2012.
14  Q.  Do you know what the PTSD stems from?  Is
15  it from a certain incident?
16  A.  Yes.
17  Q.  What happened?
18  A.  Actually, it's an assault that happened
19  while I was in the military.
20  Q.  How long were you in the military?
21  A.  From 1990 to 1993.
22  Q.  And you were diagnosed with PTSD in 2012.
23  Was there any kind of incident that triggered from
24  the PTSD from the prior Army assault?

**4 (Pages 10 to 13)**

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

14

1    A.    Actually, I was -- I was checked into a
2    mental institution --
3    Q.    Was that in 2012?
4    A.    -- slash hospital. That was in 2012.
5    Q.    And what did they tell you at the hospital?
6    A.    They went over my history, and at that time
7    they diagnosed me with PTSD.
8    Q.    Has somebody told you that PTSD stems from
9    the assault in the Army when you were enlisted?
10   A.    In the marine corp, yes.
11   Q.    I'm sorry, the marine corp.
12         Who told you that?
13   A.    A doctor at the hospital I was -- I was at.
14   Q.    What hospital did you treat at?
15   A.    That was -- I can't remember the hospital's
16   name offhand, but it is in my medical records.
17   Q.    Do you have a copy of your medical records
18   from that hospitalization?
19   A.    To my understanding, we are not, as
20   inmates, allowed to possess medical records while
21   we're incarcerated.
22   Q.    I'm asking you whether you have access to
23   those records or not?
24   A.    I don't have access to them, but they're

15

1    here because the institution actually sent it to the
2    hospital to acquire those records.
3    Q.    Understood.
4          Let's talk about the September 16th, 2013
5    incident. Can you describe that incident in your
6    own words?
7    A.    Would you like me to go from start to end?
8    Q.    Well, let's start with -- my understanding
9    is there was an overflowing toilet in your cell; is
10   that correct?
11   A.    That is correct.
12   Q.    What caused the overflowing toilet in your
13   cell?
14   A.    I have absolutely no idea what caused it.
15   Basically that evening, approximately 23:15 hours, I
16   was sitting on a footlocker about to take off my
17   shoes and get prepared for bed. Across the room
18   from the toilet, the water in the toilet absolutely
19   exploded covering me in raw sewage.
20         My first instinct was to get to the sink to
21   wash it out of my eyes and my mouth. At that time I
22   also went through distress due to irregularities in
23   my heart beat, chest pains, shortness of breath.
24   Basically I banged on the door as long as I could to

16

1    get the officer on duty to open the door so I could
2    get out of that situation and to no avail basically.
3    Q.    Let me back up a little bit. It was not
4    the toilet in your cell that overflowed, it was the
5    toilet in the cell across from you; is that correct?
6    A.    No. No. No. It was the toilet in my
7    cell. I was sitting across the room from the
8    toilet.
9    Q.    Can you describe your cell as far as the
10   size of it?
11   A.    I think basically most cells are about the
12   same, eight and a half feet by -- eight and a half
13   by 13. So I'm sitting on the opposite side of the
14   room from the toilet.
15         I just want to add that the burst out of
16   the toilet was so violent there was defecation four
17   feet high on the walls so...
18   Q.    What do you you mean by defecation?
19   A.    Human waste, solid human waste.
20   Q.    You were sitting on your footlocker near
21   the door to the cell; is that correct?
22   A.    That is correct.
23   Q.    And the toilet is on the other side of the
24   cell?

17

1    A.    Correct. Not long ways, short ways.
2    Q.    Did you have a roommate or a celly at the
3    time?
4    A.    I did at the time. His name is
5    Mr. Bassamy.
6    Q.    Can you spell that?
7    A.    He was actually -- B-A-S-S-A-M-Y, first
8    name Gabriel.
9    Q.    And this is cell number 18; is that
10   correct?
11   A.    That is correct.
12   Q.    And it was in the G2 unit at PICC?
13   A.    That is correct.
14   Q.    Was Mr. Bassamy in the cell when the toilet
15   exploded?
16   A.    Yes, he was. He also was contaminated with
17   raw sewage. He was actually about to climb the
18   ladder to get on the top bunk. So we were pretty
19   much in the same proximity.
20   Q.    Mr. Bassamy was not using the toilet at the
21   time; is that correct?
22   A.    No. No one was using the toilet.
23   Q.    Did you look at the toilet at any point in
24   the day prior to this incident?

5 (Pages 14 to 17)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

18

1    A.    Yes, the toilet was working fine all day.
2    Q.    Did you observe anything in the toilet?
3    A.    I'm sorry?
4    Q.    Did you observe anything in the toilet that
5    was obstructing the toilet?
6    A.    No, not at all.
7    Q.    So as you sit here today --
8    A.    I also would like to add --
9    Q.    As you sit here today you have no idea why
10   the toilet exploded?
11   A.    No, I do not.  But I'd also like to add
12   that the cell directly next to ours overflowed also
13   that same night.  Throughout the night the toilet in
14   my cell overflowed approximately every 10 minutes
15   throughout the night until that next morning when
16   they brought emergency maintenance people on the
17   block.
18   Q.    The first time it overflowed was about
19   11:15 p.m.; is that correct?
20   A.    Yes, sir.
21   Q.    And it continued to overflow throughout the
22   night; that's your testimony?
23   A.    Yes, sir.
24   Q.    What time in the morning did -- you said

19

1    repairmen came out to repair the toilet; is that
2    right?
3    A.    I'm sorry, one repairman came in the
4    morning.  Our doors were actually opened at -- I
5    believe at around 7 -- 07:30.
6          But I'd also like to add that because of
7    the constant overflowing all night, the correctional
8    officer, her name was Walden, she actually allowed
9    an inmate, a block worker, to come out of his cell.
10   She posted him outside of my cell door all night
11   just to mop so the raw sewage wouldn't go across the
12   tier into other cells.
13   Q.    Who was that inmate?
14   A.    I don't have his name.
15   Q.    What time were you let out of your cell the
16   next morning?
17   A.    I believe it was approximately 7:30.
18   Q.    Between the hours of 11:15 p.m. and 7:30
19   a.m. the next day did you speak to any PICC
20   employees other than Correctional Officer Walden?
21   A.    No.  The only person that I had contact
22   with is Correctional Officer Walden.  I continued to
23   bang on the door for the first hour after the
24   incident happened.  She continued to walk by and act

20

1    like she couldn't hear me.
2          At that point, because I was in distress, I
3    had to actually lay down and try to calm myself down
4    because of the chest pains.  At that point my celly,
5    Mr. Bassamy, continued to bang on the door to no
6    avail.  The door was not opened, but she did let the
7    block worker out to clean and make sure that raw
8    sewage didn't spread.
9          And also the cell next to ours, she allowed
10   those inmates to evacuate their cell, clean their
11   cell and lock them back in, but we weren't allowed
12   to.
13   Q.    When you say the block worker, I'm a little
14   confused as to who that is.  Is that someone from a
15   different cell than yours?
16   A.    That is correct.  He was on the same tier
17   as me.  His job on the block was to sweep, mop,
18   clean showers during the day.  So he's, I guess you
19   would say, kind of like a trustee for the block.
20   He's a long-term incarcerated inmate in the county.
21   Q.    And you said that he was mopping the area
22   all night long?
23   A.    That is correct.
24   Q.    What time did he start mopping?

21

1    A.    Approximately 10 minutes after the toilet
2    exploded.  She went down, she unlocked his door, he
3    came out and got the equipment and basically
4    squeegeed and mopped raw sewage into the drain
5    system.  And he did that all night to my knowledge.
6    Q.    At some point did you request medical
7    attention?
8    A.    I asked Officer Walden -- at that point I
9    was banging on the door letting her know that I
10   needed medical attention.  I was totally ignored.
11   She never even spoke to me.
12   Q.    Do you know Officer Walden's first name?
13   A.    No, I do not.  I'm assuming -- I believe we
14   had a difference in opinion as far as when we met
15   last time with the judge as to how to find Officer
16   Walden.  I believe that all officers are required to
17   log in and out.  So on that day during the overnight
18   graveyard shift that's the only person who was
19   there.
20   Q.    What time did you request medical attention
21   for the first time?
22   A.    Right away.
23   Q.    So around 11:30?
24   A.    Yes.

6  (Pages 18 to 21)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

22

1    Q.      Did you write up a sick call request at
2    some point?
3    A.      I actually did -- I believe over the next
4    week I probably submitted six or seven sick call
5    requests.  After the last one I was told by a
6    doctor, who normally does sick calls, that my sick
7    call request would no longer be accepted.
8    Q.      What doctor was that?
9    A.      I have no idea of what her last name is.  I
10   believe she is of Indian decent.
11   Q.      Well, I'm looking at the attachments to
12   your complaint.  It looks like this sick call
13   request that I'm looking at is labeled Exhibit 2A.
14           Do you have a copy of your complaint there?
15   A.      Not in front of me.
16   Q.      Do you recall making a sick call request,
17   and this one is dated September 17th, 2013?  It says
18   medical problem, you wrote shortness of
19   breath, throwing up, diarrhea, rash, facial and arms
20   due to exposure of raw sewage for several hours.
21           Is that familiar to you?
22   A.      Yes, sir.
23   Q.      Do you recall writing up that sick call
24   request?

23

1    A.      Yes, sir.
2    Q.      The date on it, it has a 9, a dash and then
3    something written and scribbled out and then a 17
4    written over whatever was scribbled out.
5            Do you know what was written prior to it
6    being scribbled out and 17 being placed above it?
7    A.      To my knowledge there shouldn't be anything
8    scribbled on it.
9    Q.      Okay.  The date on it with the correction,
10   whatever it was, is 9/17/2013.  Is that the date
11   that you wrote this sick call request and submitted
12   it?
13   A.      I believe so, that would be the day after.
14   Q.      What time of day did you submit -- write it
15   and submit it?
16   A.      I'm not sure what time of day it was.
17   Q.      Could you tell me whether it was the
18   morning, the afternoon, the evening?
19   A.      I cannot give you a specific -- when it
20   was.
21   Q.      That sick call request was your first sick
22   call request that you prepared after this incident;
23   is that correct?
24   A.      It happened on the 16th, yes, I would

24

1    concur with that.
2    Q.      When did you start experiencing shortness
3    of breath?
4    A.      During the incident.
5    Q.      How soon after the incident did you have
6    shortness of breath?
7    A.      I would say when the chest pain started.
8    Q.      When did the chest pain start?
9    A.      Pretty much right after the incident
10   happened while I was at the sink.
11   Q.      So maybe a few minutes afterwards, a few
12   hours afterwards?
13   A.      A few minutes.
14   Q.      It also -- the sick call request also says
15   that you were throwing up.  When did you throw up?
16   A.      I threw up in the cell.  And also I have
17   periods of throwing up, vomiting days following.
18   Q.      When did you stop throwing up?
19   A.      It wasn't more than maybe four days.
20   Q.      You were throwing up for four days?
21   A.      Not constantly.  Periods, yes.
22   Q.      So this incident happened on the night of
23   the 16th.  Is it your testimony that you threw up on
24   the 16th, the night of the 16th, the 17th, the 18th

25

1    and the 19th?
2    A.      That is correct, sir.
3    Q.      When did you start experiencing diarrhea?
4    A.      I would say the night -- the night -- the
5    evening of the 17th.
6    Q.      How long did you have diarrhea?
7    A.      I believe two days.
8    Q.      And you also said that you had a rash.  Can
9    you tell me about the rash?
10   A.      I had patches of rashes from my scalp all
11   the way down my body, which the medical department
12   examined.
13   Q.      Now, you kind of just said that you had
14   rashes covering your body.  Was that your entire
15   body?
16   A.      Not the entire body, but in patches, yes.
17   From my scalp all the way down including athlete's
18   feet (sic), rash on my feet.
19   Q.      Did the -- did this incident cause you to
20   have athlete's foot?  Is that your understanding?
21   A.      I would say yes because I didn't have any
22   foot fungus prior to this incident.  My best
23   assumption would be from actually standing in an
24   inch of raw sewage is probably what caused that, not

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

26

1  to mention, I was soaked in it.
2  Q.      There was one inch of raw sewage in your
3  cell?
4  A.      Exactly.  What happens is, those cells --
5  the layout of those cells, they're slanted.  So if
6  something overflows, the cell actually fills up
7  about an inch before gravity will push anything out
8  under the door.  So it was about maybe an inch of
9  raw sewage on the floor, which I was ordered to
10  clean up the day after with no protective gear.
11  Q.      Did you follow that order and clean it up?
12  A.      I did.  I followed that order.  I actually
13  cleaned the cell before they allowed me to take a
14  shower to get the raw sewage clothes off of me.
15  After that I was allowed to proceed to medical.
16  Q.      What time did you proceed to medical?
17  A.      I would assume it would be around 9
18  o'clock.
19  Q.      9 a.m. on September 17th you went to
20  medical?
21  A.      That is correct, sir.
22  Q.      Can you tell me about your treatment at
23  medical?
24  A.      Okay.  I proceeded to medical.  Once I got

27

1  there I let them know that I was in distress.  I had
2  chest pains, shortness of breath.  I sat in the
3  waiting room.
4          Approximately 15 minutes later I was called
5  to the next corridor where one of the defendants'
6  nurse, RN McGrogan, came over to me.  I explained to
7  her that I had CAD.  At that point I requested a
8  Nitrostat Tab.  She then proceeded to put a finger
9  monitor on my finger and walked away from me.
10          Approximately two minutes passed by, she
11  came down, she took the finger monitor off.  I asked
12  her again for a Nitrostat Tab and her exact words
13  were, you're wasting my time.  And she ordered me
14  back to the block.
15  Q.      Did you receive any other treatment while
16  you were at medical other than what you just
17  described?
18  A.      Absolutely none.
19  Q.      Did you return to medical at any point?
20  A.      The only time I went back to medical was
21  right before I was being transferred upstate and
22  that was for checking out purposes.
23  Q.      When were you transferred upstate?
24  A.      I believe November 11th of 2013.

28

1  Q.      So if I understand you correctly, between
2  September 17th, 2013 and November -- November 7th,
3  2013 you did not see a medical professional at PICC?
4  A.      No, I did see a medical professional.  It
5  just wasn't in the medical department.  From filling
6  out the sick call slips they would call me over to
7  the mini triage which is right outside the block.
8          In those sessions describing the fungus on
9  my feet, the rashes, the stomach problems, the
10  violent vomiting, the severe headaches for I would
11  say probably weeks, they treated me for those
12  things.
13          For the fungus they gave me fungal cream.
14  For the violent vomiting they gave me antacids for
15  my stomach.  For the chronic headaches they gave me
16  aspirin.  Actually I saw someone, but it just wasn't
17  in the medical department.
18  Q.      Was the person you saw at the medical
19  triage, was that a nurse?
20  A.      I believe she was a doctor.
21  Q.      You saw a medical doctor?
22  A.      This is the same -- I'm sorry.  This is the
23  same person that told me my sick call requests would
24  no longer be honored.

29

1  Q.      Do you know who that person is?
2  A.      I do not know her name.  She is of Indian
3  decent.
4  Q.      And your understanding is that that's a
5  medical doctor?
6  A.      Yes.
7  Q.      Did you receive any diagnoses from the
8  doctor or the nurse that you saw?
9  A.      No, I did not, other than just saying that
10  these are minor problems.
11  Q.      I'm going to move onto your grievances.  Do
12  you have a copy of your grievances that you filed?
13  A.      Not in front of me.
14  Q.      I'm looking at Exhibit Number 1 from your
15  complaint.  Attached is a grievance.  The grievance
16  is dated, September 17th, 2013.
17          Do you recall submitting a grievance on
18  September 17th, 2013?
19  A.      Yes, sir.
20  Q.      Just to summarize the grievance, it appears
21  to be involving the overflowing toilet in your cell.
22  And you mentioned shortness of breath, vomiting,
23  diarrhea, rash as a result of the overflowing
24  toilet.

8  (Pages 26 to 29)

TROY LAMONT MOORE, SR.

30

1     Are you familiar with that grievance?
2  A.   Yes, sir.
3  Q.   Was that the first grievance you submitted
4  following this incident?
5  A.   Yes, sir.
6  Q.   Is this grievance grieving any particular
7  employee at PICC?
8  A.   You're asking me if it's grieving any
9  particular person?
10 Q.   Yes.
11 A.   I don't have the grievance in front of me.
12 Q.   Do you recall who this grievance was
13 directed at, if anybody?
14 A.   I would venture to say that the issue
15 started with CO Walden.
16 Q.   I'll represent to you that Correctional
17 Officer Walden is not mentioned in this grievance.
18 Nowhere in this grievance does her name appear.
19 A.   Okay.
20 Q.   Do you recall writing a grievance with
21 Correctional Officer Walden's name?
22 A.   I believe I did.  I just don't know which
23 one.
24 Q.   I'm going to move onto the next page of the

31

1  Exhibit 1.  It appears to be another grievance that
2  you filed.  It's dated October 4th, 2013.
3     Can you explain to me why you submitted the
4  second grievance?  It talks about how the first
5  grievance wasn't remedied.  So can you explain that?
6  A.   Actually there was -- they never even
7  answered the first grievance.  There was no
8  response.
9  Q.   Okay.  This second grievance dated October
10 4th, 2013, did you file this because you did not get
11 a response to your first grievance?
12 A.   Would you care to read the grievance to me?
13 Q.   Sure.  I declare or certify, verify or
14 state under the penalty of perjury under the laws of
15 the United States of America that the foregoing is
16 true and correct.  This is in reference to a
17 previous grievance filed.  The grievance was
18 reviewed by Major Martin and only partially
19 remedied.
20    Part 1 of the action, requested medical
21 needs was initiated.  However, part 2, action
22 requested procedural amendment to ensure no
23 reoccurrence was inadequately addressed.  I'm
24 formally requesting that this continuation grievance

32

1  be appealed in order to be reviewed by the
2  superintendant at the next grievance level seeing
3  that the initial grievance was not reviewed by a
4  board.
5  A.   Okay.  I believe in the rules and
6  regulations of filing grievances, the grievance is
7  supposed to be submitted to a board.  That was not
8  done.  Also I asked for a procedural amendment so
9  this doesn't happen again.
10    There is absolutely nothing in place at
11 that level at PICC to ensure that other inmates
12 don't have to go through this.
13 Q.   Where is your procedural amendment?  Is
14 there a procedure proposed?
15 A.   No, I do -- what I was looking for was to
16 come up with some common ground to submit a
17 procedural amendment.
18 Q.   You never got to the stage of actually
19 submitting one; is that correct?
20 A.   No, at every level the grievances were
21 brushed off as -- there was no action taken.
22 Q.   There's a few parties in this lawsuit, and
23 I'm going to talk to you about them in a little bit.
24 You have sued Commissioner Giorla.

33

1     Can you tell me about your interaction with
2  Commissioner Giorla, if there was one?
3  A.   Okay.  After all three grievance levels
4  were pursued per the rules and regulations of
5  submitting grievances in this process, I personally
6  spoke to Commissioner Giorla about the situation.
7  Absolutely no action was taken.
8  Q.   When did you speak with Commissioner
9  Giorla?
10 A.   I believe three or four days after the
11 incident occurred.  He was actually at PICC and I
12 spoke to him candidly.  If need be, I guess it can
13 -- the video can be retrieved because it was in shot
14 of a camera.  So...
15 Q.   Where did you speak with Mr. -- or
16 Commissioner Giorla?
17 A.   On the G2 block.
18 Q.   What time was it when you spoke with him?
19 A.   I would say approximately 10:00 or 11:00 in
20 the morning, a.m.
21 Q.   And it was either on September 19th or
22 September 20th; is that correct?
23 A.   I believe so.
24 Q.   What did you say to Commissioner Giorla?

9  (Pages 30 to 33)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

34

1   A.      I explained the entire situation that had
2   happened.  I also explained that I had submitted
3   grievances trying to get some resolution.  His
4   response to the whole conversation was that his
5   officers are to handle things at their level,
6   meaning it's not his concern.
7   Q.      What did you ask Commissioner Giorla to do?
8   A.      To look into the situation and hopefully
9   find a remedy.
10  Q.      Did you propose a remedy to Commissioner
11  Giorla?
12  A.      No, I did not.
13  Q.      What exactly were you looking for him to
14  do?
15  A.      To actually put something in place where
16  this type of incident doesn't have to happen again.
17  For one, he already stated that his guards are to
18  handle it at their leisure at that level.
19          My whole thing is, just when they had the
20  meeting in Major Martin's office, the first thing
21  she did when she found out about the situation, she
22  ordered one of her guards to pull the videotape
23  immediately.  Okay.
24          Her first instinct was to let me know that

35

1   at that time of night, after 23:00 hours the guard
2   can't open doors for anyone.  But the video footage
3   obviously will contradict that.  Because not one,
4   but two cells were open for cleaning purposes.
5           So everyone is given the same runaround
6   here.  And I looked towards Commissioner Giorla to
7   rectify this situation so this type of thing doesn't
8   happen anymore.  And he basically brushed it off.
9   Q.      What does Commissioner Giorla look like?
10  A.      He's quite heavyset.  He's shorter than me.
11  I'm 6'3" and three-quarters.  So he's approximately
12  -- I would say 5'9", very heavyset man.
13  Q.      How old is he?
14  A.      I would venture to say in his late 40s,
15  early 50s.
16  Q.      What color is his hair?
17  A.      That I don't remember.
18  Q.      Does he wear glasses?
19  A.      At that time I don't remember him having
20  glasses on.
21  Q.      What was he wearing when you spoke with
22  him?
23  A.      He was wearing a button up shirt, dress
24  shirt and slacks.

36

1   Q.      Was he in uniform?
2   A.      No, he was not.
3   Q.      I want to talk to you about Major Martin.
4   Can you tell me your interaction with Major Martin?
5   A.      Basically at the second level of the
6   grievance system I was called to Major Martin's
7   office.  To my understanding, she serves on the
8   grievance board at that level.
9           Once the correctional officer picked me up
10  from the block and escorted me to her office I went
11  inside.  She asked me what the situation was.  I
12  explained to her in great detail about the cell
13  overflowing, the toilet overflowing, not being able
14  to get medical attention that night until the next
15  morning, where I still didn't get medical attention,
16  the medical issues that were going on.
17          She, at that point, ordered the guard that
18  escorted me to go and remove the tape and preserve
19  the tape.  She said she would look into things.  I
20  never heard anything else at that level from her.
21  Q.      When did you speak with Major Martin?
22  A.      I don't recall what day it was.
23  Q.      Do you know how many days after this
24  incident you spoke with Major Martin?

37

1   A.      It may have been two to three weeks
2   afterwards.
3   Q.      You first spoke with Major Martin two to
4   three weeks after this incident?
5   A.      I believe so.
6   Q.      So you spoke with Commissioner Giorla prior
7   to speaking with Major Martin?
8   A.      That is correct.
9   Q.      You had a meeting with Major Martin in her
10  office?
11  A.      That is correct.
12  Q.      Where is her office?
13  A.      I couldn't give you a floor plan.  I don't
14  -- that's my first time in PICC.  So all I know is
15  how to get to the block, but I was escorted, so...
16  Q.      Is Major Martin's office in PICC?
17  A.      Yes, it is.
18  Q.      You didn't have to go outside to get there?
19  A.      No.
20  Q.      You said that Major Martin told you she was
21  going to pull the video?
22  A.      She instructed the escorting officer to
23  immediately pull and preserve the video.
24  Q.      When you are referring to a video, what

10  (Pages 34 to 37)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

38

1    video camera are you talking about?
2    A.    The video camera that is on G2 unit.
3    Q.    How many video cameras are on G2?
4    A.    I'm not sure.
5    Q.    Did you see a video camera on G2?
6    A.    Yes.
7    Q.    How many video cameras did you see?
8    A.    I know of one.  There's definitely one.
9    Q.    Where is the one that you know of?  Where
10   is that located on G2?
11   A.    The front half of the block.
12   Q.    So there's one video camera on the front
13   half of the block that faces down the hallway of the
14   cells; is that correct?
15   A.    It actually faces the front of the cells
16   excluding the corridor, which is at the back of the
17   block.  So the video footage would absolutely,
18   definitely show that I was banging on the door, that
19   other inmates were let out, that my cell was
20   overflowing all night, which is why it's imperative
21   that I examine that evidence.
22   Q.    I think you referenced that you requested
23   the video be preserved.  When did you make a request
24   that the video be preserved?

39

1    A.    That -- at that meeting with Major Martin.
2    Q.    Was that requested in writing?
3    A.    No, it was not.
4    Q.    Do you have a copy of any requests you made
5    to preserve the video of this incident?
6    A.    Absolutely not.  It was verbal from me to
7    her and it was verbal from her to her CO.
8    Q.    What does Major Martin look like?
9    A.    She's an African American woman.  I would
10   probably say in her late 40s, early 50s.  Her office
11   is very small.  It's actually crowded by a desk that
12   probably takes up most of the office.
13   Q.    Can you describe her build?
14   A.    She is shorter than me.  I would probably
15   say maybe 5'5, 5'6".  Medium build.  She's not
16   heavyset and she's not thin.
17   Q.    I don't think you mentioned with
18   Commissioner Gioria, what race is he?
19   A.    He's Caucasian.
20   Q.    Correctional Officer Walden, you talked
21   already about when you came into contact with that
22   officer.  Is she a female officer?
23   A.    Yes, she is.
24   Q.    Can you give me a physical description of

40

1    Correctional Officer Walden?
2    A.    She's an African American woman.  I would
3    put her taller than Major Martin.  So she's probably
4    about 5'9", 5'10".  Probably early to mid 50s.
5    She's a little bit older.  Very thin build.
6    Q.    Who is Larry Rodriguez?
7    A.    Larry Rodriguez is another inmate who was
8    incarcerated at the same time I was on G2.  He
9    actually -- several inmates actually witnessed the
10   overflowing of the raw sewage coming from my cell
11   out onto the floor.
12         His cell was in proximity where he could
13   see the front door of my cell.  That is why I
14   ascertained an affidavit from him.
15   Q.    Do you know what cell number he was in?
16   A.    Not cell number.  I can't recall the
17   number.
18   Q.    But you said he was across from you?
19   A.    Actually, it's on the upper tier.  It's the
20   last cell, which would be the closest to the CO's
21   desk upstairs.  So his --
22   Q.    Could he see inside your cell?
23   A.    Inside, I wouldn't say that, no.  He could
24   see -- he can see my window and he can see the

41

1    bottom of the door.  But as far as visual, inside
2    the cell, I wouldn't think so.
3    Q.    Did you talk to Mr. Rodriguez before he
4    prepared this affidavit?
5    A.    I believe the only thing that I said to him
6    was I would like to ascertain an affidavit from you,
7    if you could write down exactly what you saw and
8    what time it was, and that's what he did.
9    Q.    You didn't give Mr. Rodriguez any
10   information before he prepared this affidavit?
11   A.    I don't believe so.
12   Q.    Is Mr. Rodriguez a friend of yours?
13   A.    No.  I had probably known him -- at that
14   point I had probably known him maybe two weeks.
15   Q.    Is there a reason you asked Mr. Rodriguez
16   to prepare an affidavit as opposed to someone else?
17   A.    Because of the position of his cell.
18   Q.    Because he was above your cell?
19   A.    Because he could see the front of my cell
20   from his cell.
21   Q.    Who is Rodney Johnson?
22   A.    He's another gentleman who was incarcerated
23   at the same time.  He was living on G2 with me.  His
24   cell is actually on the lower tier across from my

11  (Pages 38 to 41)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

42

1     cell.
2             MR. SHOTLAND:  The other attorney
3     who is here might have a couple questions
4     for you.  I might have a couple after he's
5     done.  Thank you for your time and I'll let
6     him go.
7             THE WITNESS:  Okay.  Thank you.
8     BY MR. FERRANTE:
9     Q.     Good afternoon, Mr. Moore.  My name is
10    Alexander --
11    A.     Good afternoon.  How are you, sir?
12    Q.     I'm fine.  Can you hear me okay?
13    A.     Actually, I can barely hear you.  Hold on
14    one second.
15    Q.     Mr. Moore, my name is Alexander Ferrante.
16    I represent Nurse McGrogan and I have a few
17    questions for you.
18            What are all those documents you have in
19    front of you?
20    A.     Actually, I have a presentation for the
21    opening statement I gave.  I also have some legal
22    documentation, case law as to what can be done and
23    what can't be done.  And then I have several
24    documents as far as what's been filed and what

43

1     hasn't.  And also things from the medical department
2     and denying me access to contact both counsel for
3     the defendant.
4     Q.     Did you bring with you your complaint?
5     A.     No, I did not.
6     Q.     What legal documents did you bring then?
7     A.     The ones I just described to you.
8     Q.     You haven't described any to me.
9             What legal documents are sitting in front
10    of you?
11    A.     Okay.  I have the order from the judge
12    granting a motion to compel.
13    Q.     Excuse me, Mr. Moore --
14    A.     I have a notice of --
15    Q.     Mr. Moore, let's go back to that.  Go back
16    to that order.  What's the date of that?
17    A.     Third day of December, 2013.
18    Q.     What else do you have?
19    A.     I have notice of deposition from you.  I
20    also have the video conference order.  I have the
21    first scheduling order and also the pretrial
22    conference and hearing on my motion to the judge.
23    Q.     So you knew we were going to take your
24    deposition today?

44

1     A.     Yes, which I objected to.
2     Q.     And although you knew we were going to take
3     it, you chose not to bring the copies of your
4     grievances or a copy of your complaint?
5     A.     I wasn't instructed to bring those things.
6     Q.     Well, you weren't instructed to bring what
7     you've brought with you today, you still brought
8     them.
9     A.     Correct.
10    Q.     Did you -- do you have any personal notes
11    at all about what took place on September 16th or
12    the 17th?
13    A.     Personal notes?
14    Q.     Yes.  Did you take down any notes, write
15    anything down on paper?
16    A.     No.
17    Q.     Keep a diary at all?
18    A.     No, all I have is my original complaint.
19    Q.     Let's talk about the night of September
20    16th.  You said you were near the footlocker --
21    sitting on the footlocker, there was an explosion,
22    stuff comes all out of the toilet.  I want to start
23    from that moment.  Okay?
24    A.     Yes, sir.

45

1     Q.     When did it stop coming out of the toilet?
2     A.     It didn't because it continuously
3     overflowed.  Every 10 minutes it would overflow.
4     Q.     That leads me to believe at one point it
5     has to stop in order for it to continue?
6     A.     That is correct.
7     Q.     So when did it first stop?
8     A.     It overflowed for approximately 15 to 20
9     seconds and then it would stop.
10    Q.     Now, during that first time, that 15 or 20
11    seconds when it overflowed you were near your
12    footlocker?
13    A.     Correct.
14    Q.     Now, after it stopped, did you clean
15    yourself up?
16    A.     The only thing I did was I washed the raw
17    sewage out of my face.
18    Q.     Did you wash your hands?
19    A.     I rinsed my hands.
20    Q.     Did you change clothing?
21    A.     No, I did not.
22    Q.     Well, it's September, it's in the prison,
23    were you just wearing your boxers?
24    A.     Actually, I was about to get undressed for

12 (Pages 42 to 45)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

46

1  bed.  I was sitting on the footlocker taking off my
2  shoes when the toilet exploded.  And at that time I
3  only had one set of prison uniform and one pair of
4  sheets.  Might I add, I had to sleep on those soiled
5  sheets for two days before I could get them changed.
6  Q.     Now, since you saw that the footlocker --
7  I'm sorry, since you saw that the toilet exploded, I
8  would imagine you kept your shoes on?
9  A.     Actually I did.
10 Q.     Now, did you keep them on for the rest of
11 the evening until the early morning?
12 A.     No, I did not because the raw sewage had
13 seeped down into the shoes.
14 Q.     Well, we talked about the first incident,
15 there was a 15 second burst, it stopped.  When did
16 the next one happen?
17 A.     Approximately 10 minutes later.
18 Q.     How long did that last?
19 A.     About the same length in time, but granted
20 when other toilets would flush on the upper tier,
21 our toilet would overflow in between those intervals
22 of 10 minutes.
23 Q.     So did you put anything over the toilet to
24 stop it from overflowing?

47

1  A.     Absolutely not.
2  Q.     Did you put anything into the toilet to try
3  to clog it up?
4  A.     Absolutely not.
5  Q.     Now, how many inches off the floor is the
6  first bunk bed?
7  A.     I would estimate maybe a foot and a half,
8  two feet.
9  Q.     So if someone is sitting on the first bunk
10 bed you wouldn't be in the raw sewage?
11 A.     That's correct.  You wouldn't be in the raw
12 sewage.
13 Q.     Is there a reason why you didn't stay on
14 the bed?
15 A.     Once the incident happened I was actually
16 covered in sewage.  So me laying down in bed, which
17 I eventually did being in distress, I was still
18 covered in raw sewage.
19 Q.     That's not my question.
20       Why wouldn't you just stay in bed so your
21 feet wouldn't be in it?
22 A.     The reason for that is because I was
23 banging on the door trying to get CO Walden's
24 attention to open the door because I was in distress

48

1  and needed medical attention.
2  Q.     After that didn't work, why didn't you just
3  stay in the bed?
4  A.     I did.
5  Q.     So was there only one time you left the bed
6  to go over to the cell door and try to get her
7  attention?
8  A.     Once that incident happened I banged at the
9  door.  The banging lasted about maybe 45 minutes to
10 no avail.  After that I sat on my bunk in the bed
11 covered in raw sewage, yes.
12 Q.     So we're talking about a time period from
13 11:15 to about 7:30 in the morning, correct?
14 A.     That is correct.
15 Q.     During that entire time there was a period
16 of 10 to 15 minutes that you tried to get someone's
17 attention?
18 A.     I'm sorry, can you repeat the question?
19 Q.     Well, from 11:15 to 7:30 you told us that
20 you were sitting on the bed except for about 10 to
21 15 minutes where you were trying to get someone's
22 attention at the door?
23 A.     That's incorrect.
24 Q.     What's incorrect about it?

49

1  A.     I stated that for 45 minutes I tried to get
2  her attention at the door.  After that time I sat in
3  my bunk.  The toilet overflowed every 10 minutes.
4  Q.     How long were you at the door total trying
5  to get her attention?
6  A.     I was at the door for about 45 minutes and
7  then my cellmate, Mr. Eassamy, took over.
8  Q.     Mr. Moore, what medications are you on
9  today?
10 A.     I'm on an aspirin a day for my heart.  I am
11 on Nitrostat Tabs, which is Nitroglycerin, which is
12 PRN for my CAD and I'm also on Risperdal.
13 Q.     Are you on Zantac at all?
14 A.     No.
15 Q.     What was the Zantac for?
16 A.     Zantac?
17 Q.     Yes.
18 A.     When was that administered?
19 Q.     Well, that was administered as soon as you
20 got to the prison in July of 2013 and it continued.
21 A.     Do you know what that medication is for?
22 Q.     It's a mental health medication.  Do you
23 have a mental health problem?
24 A.     I do.  I have PTSD.  That medication was

13 (Pages 46 to 49)

TROY LAMONT MOORE, SR.

54

1  from a finger monitor. Because that's all the
2  entire medical visit consisted of.
3  Q.    When you got down to medical they did an
4  exam on you and they found no shortness of breath.
5        Do you know what shortness of breath is?
6  A.    Absolutely I do.
7  Q.    Were you having shortness of breath at 9:00
8  or 9:30 a.m.?
9  A.    I was.
10 Q.    Were you having a rash at 9:00 or 9:30 a.m.
11 that morning?
12 A.    At -- that morning the rash hadn't started
13 yet.
14 Q.    Were you complaining of chest pain at 9:00
15 to 9:30 in the morning?
16 A.    I was.
17 Q.    Can you explain how you can have chest
18 pain, but have a normal oxygen rate and a normal
19 pulse rate?
20 A.    No, I cannot.
21 Q.    Were you vomiting that morning in the
22 medical department?
23 A.    Not in the medical department, no. The
24 visit was very short.

55

1  Q.    So in the medical department there was no
2  vomiting going on? No diarrhea?
3  A.    No, I did not vomit.
4  Q.    Any diarrhea in the medical department?
5  A.    Not in the medical department, no.
6  Q.    Any complaints of headaches in the medical
7  department?
8  A.    Yes, I did tell her about the headaches.
9  And I also explained it was probably breathing the
10 raw sewage for over eight hours.
11       I do have a question. How can -- how is it
12 possible to determine oxygen in the blood with a
13 finger monitor?
14 Q.    In your complaint you list a bunch of
15 things that -- a bunch of your injuries. It's on
16 page 3.
17       Do you realize that headaches was not one
18 of the things that you complained about?
19 A.    It may not have been. I also have
20 something to add. If the headaches or the vomiting,
21 stomach problems weren't there, why was the medical
22 department prescribing medication to treat it?
23 Q.    When did you go back to medical?
24 A.    I was basically going -- dropping a sick

56

1  call slip every day.
2  Q.    Well, do you remember going back?
3  A.    I never went back to the medical
4  department. I went to the triage, which is right
5  out of the block.
6  Q.    When was the next time you had any type of
7  medical treatment?
8  A.    I believe the following day.
9  Q.    And who treated you then?
10 A.    The doctor on duty.
11 Q.    By that time was your cell cleaned?
12 A.    Yes, I was ordered to clean the cell before
13 I could even go to medical that day.
14 Q.    So it had been cleaned by the time you left
15 at 9 o'clock?
16 A.    That is correct.
17 Q.    Any trouble cleaning the cell?
18 A.    Just basically exposing myself further to
19 the raw sewage with no protective gear. To my
20 understanding, that prison officials are supposed to
21 have designated HAZMAT people to clean up bodily
22 fluids, which did not happen.
23 Q.    But you had no trouble physically cleaning?
24 A.    Sure there was trouble.

57

1  Q.    Did you have a mop?
2  A.    No, I did it on my hands and knees.
3  Q.    What about your roommate, did he do it on
4  his hands and knees too?
5  A.    No. At 7:30, when they cracked the doors
6  to let us out, he was summoned on a path to
7  somewhere. So I had to do everything myself.
8  Q.    Now, the next day you had some medical
9  treatment. And do you remember having your vital
10 signs taken that day?
11 A.    No, I do not remember per se.
12 Q.    You were complaining that your stomach was
13 upset.
14 A.    Okay.
15 Q.    Does that refresh your memory at all?
16 A.    I believe my stomach was upset at that
17 point.
18 Q.    They asked you if you have shortness of
19 breath and you said no --
20 A.    The following day you're talking about?
21 Q.    Yes.
22 A.    You're talking about the 18th?
23 Q.    I'm talking about the 18th. That's the
24 following day; isn't it?

15 (Pages 54 to 57)

TROY LAMONT MOORE, SR.

58

1  A.     It is the following day.
2  Q.     And you weren't complaining of shortness of
3  breath then?
4  A.     Okay.  If that's what it says, that's what
5  it says.
6  Q.     Don't you remember -- you have no memory of
7  the following day what your symptoms were?
8  A.     You're asking -- what you're doing is
9  you're asking me to remember something from a year
10 and a half ago to today.  Is that what you're
11 asking?
12 Q.     I'm asking what symptoms in this traumatic
13 event in your life you were having the next day?
14 A.     Okay.  I was having stomach problems.  I
15 was still vomiting.  I was having diarrhea and
16 severe headaches.
17 Q.     You weren't having chest pains, you weren't
18 having shortness of breath?
19 A.     No.  The next day, which was the 17th,
20 which would be the day before, chest pains subsided
21 that afternoon even though I was denied the
22 Nitroglycerin.
23 Q.     The chest pain subsided on the afternoon of
24 September 17th?

59

1  A.     17th, correct.
2  Q.     When did you have any other medical
3  treatment for any other reason -- for any reason by
4  any provider?
5  A.     I was seen several days in a row for the
6  athlete's foot, for the rashes.  I was prescribed
7  the antifungal cream.  I was given Motrin for the
8  headaches.  I was given antacids for the stomach
9  problems for several days after until I was informed
10 by the doctor -- my sick call request would no
11 longer be accepted.
12 Q.     You had a sick call and you were seen on
13 September 23rd for your feet.  You had another sick
14 call and you were seen on March 23rd.  You were
15 discharged from this prison to Graterford on
16 November -- it looks like November 13th.
17        Does that correspond with your memory?
18 A.     Pretty much.
19 Q.     What is it you wanted Nurse McGrogan to do
20 for you that morning?
21 A.     It's what she didn't do.  She didn't
22 provide me any medical care.
23 Q.     So you wanted her to provide you with
24 medical care?  That's what you wanted?

60

1  A.     Correct.
2  Q.     She didn't think medical care, other than
3  what she did, was necessary.  You have a difference
4  of opinion?
5  A.     Correct.
6  Q.     And what's the basis of your difference?
7  What more was it that you wanted her to do?
8  A.     For one, she was informed by me that I take
9  Nitroglycerin.  That was denied.
10 Q.     Well, you had no shortness of breath.  She
11 thought medically you didn't need it.  There was no
12 complaints of chest pains.  There was no shortness
13 of breath.  Your oxygenation was normal.  Your pulse
14 rate was normal.  You blood pressure was normal.
15 A.     That's absolutely incorrect because I
16 informed her of the chest pains.  And like I stated
17 for the record before, the only thing that was done
18 by Nurse McGrogan while I was at medical was a
19 finger monitor.  Now if you can monitor --
20 Q.     What else did you want her to do?
21 A.     Administer medication that I'm allowed to
22 have.
23 Q.     So you wanted medication?  That's what
24 you --

61

1  A.     Correct.
2  Q.     I thought you came down there to be
3  examined and to be checked out to see what medical
4  needs you had?  Or did you just go down looking for
5  medication?
6  A.     As I stated before, I informed the block
7  officer that morning that I was having chest pains.
8  That's the only way that you can get off of the
9  block and considered an emergency.
10 Q.     Thank you.
11 A.     Thank you.
12     MR. FERRANTE:  I don't have any
13        other questions for you.
14 BY MR. SHOTLAND:
15 Q.     Mr. Moore, just very briefly, was there
16 soap in your cell?
17 A.     I'm not sure whether there was soap in the
18 cell or not.
19 Q.     You don't know whether there was soap in
20 your cell?
21 A.     Yeah, because some days -- when soap is
22 handed out, some days you may go through a period of
23 two or three days without any soap before you get
24 your renewal.

16 (Pages 58 to 61)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANI

TROY LAMONT MOORE, JR.,                          :   Civil Actiion Number 14-3873
            Plaintifff

            v.

CORRECTIONS OFFICERS  Saajida  Walton
            Defendant

DECLARATION BY PLAINTIFF TROY L. MOORE

   I, Troy L. Moore, hereby declare under penalty of perjury and pursuant to 28 U.S.C. 1746, that the
following is true and correct based upon my personal knowledge or from my review of records.
Which I am willing and available to testify before a jury trial against defendant S. Walton.

1.   On September1 6 ,2013,  I was incarcerted at the Industrial Correctional Center 8301 State Road.
Philadelphia, P a 19136., At approximately 2315 hours, the toilet violently flowed every 20 minutes
through out the night with feces and urine on the floor. At experiencing shortness of breath & chest
pains along with vomiting. I reported it to defendant S. Walton who igored my request to remove me
out of cell 18 and I requested medical attention. After being covered in and subjected to breathing raw
sewage in access of 8 hours. I was permitted to go to medical where I informed Rn. Mogrogan of chest
pain. My Puluse was taken and I was ordered back to cell 18 being not fixed. The maintenance repair
reports by staff named Mr. Lewis was assigned to my cell 18. I will be calling him and other staff
maintenance to testify under subpoenas to support my claim along with  Exhibit 1, Exhibit 2 & Exhibt 3.

CERTIFICATE OF SERVICE

I, Troy L. Moore, hereby certfiy that on  06-07-17  I caused to be served a true and correct copy the
foregoing document titled Declaration by Plaintiff Troy L. Moore to support motion for summary
judgment to the following:

VIA U.S. MAIL:                                                                        RESPECTFULLY

SUBMITTED,

 Defendant Attorney below:

BROCK ATKINS                                                        Troy L. Moore
DIVISIONAL DEPUTY CITY SOLICITOR                     ######MX-9664
CITY OF PHILADELPHIA LAW DEPT.                          SCI-Forest
1515 ARCH STREET 14TH FLOOR                             P.O. Box 945
PHILA, PA. 19102-1595                                          Marienville, Pa
16239

-1-

10