UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TROY LAMONT MOORE, SR., | ) | DEPOSITION UPON |
| | ) | ORAL EXAMINATION |
| Plaintiff, | ) | |
| | ) | OF |
| - vs - | ) | |
| | ) | TROY LAMONT MOORE, |
| COMMISSIONER LOUIS | ) | SR. |
| GIORLA, MAJOR MARTIN, | ) | |
| C.O. WALDEN, R.N. | ) | |
| MEDICAL NURSE | | |
| MCGROGAN, | | |
| Defendants. | | |

- - - - - - - - - - -

TRANSCRIPT OF DEPOSITION,
taken by and before ALEXANDRA ALVARADO,
Professional Reporter and Notary Public, at
the CRIMINAL JUSTICE COURT, 1301 Filbert
Street, Room 1106, Philadelphia, Pennsylvania,
on Monday, January 16, 2015, commencing at
2:15 p.m.

ERSA COURT REPORTERS
30 South 17th Street
United Plaza - Suite 1520
Philadelphia, Pennsylvania 19103
(215) 564-1233

ORIGINAL

TROY LAMONT MOORE, SR.

A P P E A R A N C E S :

     CITY OF PHILADELPHIA LAW DEPARTMENT

     BY:  AARON SHOTLAND, ESQUIRE

     1515 Arch Street

     14th Floor

     Philadelphia, Pennsylvania 19102

     Counsel for Plaintiff


     GOLD & FERRANTE, P.C.

     BY:  ALEXANDER R. FERRANTE, ESQUIRE

     261 Old York Road

     Suite 516

     Jenkintown, Pennsylvania 19046

     Counsel for Defendant

TROY LAMONT MOORE, SR.

3

I N D E X

- - -

WITNESS

TROY LAMONT MOORE, SR.

| EXAMINATION | PAGE |
|---|---|
| By:  Mr. Shotland | 4, 61 |
| By:  Mr. Ferrante | 42 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE MARKED | PAGE ATTACHED |
|---|---|---|---|
| (No exhibits were marked.) | | | |

- - -

**ELECTRONIC  REPORTING  STENOGRAPHIC  AFFILIATES**

TROY LAMONT MOORE, SR.

1              (By agreement of counsel, the

2         reading, signing, sealing, filing, and

3         certification of the transcript have been

4         waived; and all objections, except as

5         to the form of the question, have been

6         reserved until the time of trial.)

7

8              TROY LAMONT MOORE, SR.,

9         after having been duly sworn, was examined

10        and testified as follows:

11

12   BY MR. SHOTLAND:

13   Q.      Mr. Moore, my name is Aaron Shotland.  I

14   represent some of the defendants in this case.

15          Can you hear me okay?

16   A.      Yes, I can, sir.

17   Q.      We're going to take your deposition.  I'm

18   joined with counsel for another defendant,

19   Mr. Ferrante, who's going to have some questions for

20   you as well.  But let me start by asking you, have

21   you ever been deposed before?

22   A.      No, I have not.

23   Q.      Well, this is a deposition and I'm going to

24   ask you questions.  There's a court reporter here on

TROY LAMONT MOORE, SR.

1   this end that's going to take down all my questions

2   and all your answers.  So I'm going to give you some

3   instructions so that this deposition goes smoothly

4   and that she can record everything that's said.

5   Okay?

6   A.        Yes, sir.

7   Q.        Please try to keep your answers verbal, try

8   not to shake your head or nod your head or

9   demonstrate anything with your body.  Keep all your

10  answers verbal.  Okay?

11  A.        Yes, sir.

12  Q.        And wait until I'm finished asking a

13  question before you begin your answer, that way she

14  can write down everything that we both say.  Okay?

15  A.        Yes, sir.

16  Q.        If you don't understand a question, let me

17  know and I'll rephrase it so that you do understand

18  it.  But if you answer a question, I'm going to

19  assume that you understood it.  Okay?

20  A.        Yes, sir.

21  Q.        Have you taken any substances today that

22  would prevent you from testifying honestly and

23  accurately?

24  A.        No.

TROY LAMONT MOORE, SR.

1    Q.        How are you feeling today?

2    A.        Good.  I would like to, if possible, make a

3    short statement before we begin.  So I'll wait until

4    you're finished with instructions and then see if

5    that's allowed.

6    Q.        You can say whatever you want.  I'm done

7    instructing you, so go ahead.

8    A.        Okay.  I just have a short statement.  On

9    1/12/15 I forwarded both defendants' counsel a

10   letter advising it is imperative for a postponement

11   regarding this deposition on 1/16/15 at 2 o'clock at

12   SCI Forest.

13        On 1/12/15 I informed the Unit Manager of

14   Childs and Counsellor Price the need to contact the

15   defendants' counsel by phone.  Both parties denied

16   me access to contact the defendants' counsel

17   regarding noncompliance with Judge Robreno's motion

18   to compel for the inspection of evidence consisting

19   of the video footage, documents, repair reports and

20   medical reports.

21        On 1/12/15 I submitted inmate requests to

22   staff member SCI Force Medical Department to obtain

23   those medical records.  On 1/13/15 Bob Rumsick (ph),

24   medical records supervisor, denied my request to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

1    inspect my medical records.

2          In addition, the defendant's counsel, Aaron

3    Shotland, has failed to forward any and all evidence

4    for inspection per Judge Robreno's order to compel.

5          At this time I would like to formally

6    request the defendants contact Judge Robreno's

7    chambers by phone to ascertain subpoenas for the

8    following things:  The video footages, cell repair

9    reports, medical records and witnesses Childs,

10   Price, Sara Segal and Bob Rumsick to testify at the

11   deposition.  Thank you.

12   Q.      Are you finished?

13   A.      Yes.

14   Q.      Okay.  Thank you.

15           Can you state and spell your name for the

16   record?

17   A.      Troy Lamont Moore, T-R-O-Y, L-A-M-O-N-T,

18   M-O-O-R-E, S-R.

19   Q.      What is your date of birth?

20   A.      8/20/1972.

21   Q.      Where do you currently reside?

22   A.      At SCI Forest.

23   Q.      Do you know what town that's in?

24   A.      I do not.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

8

1   Q.        How long have you been incarcerated at SCI

2   Forest?

3   A.        Since April 1st of 2014.

4   Q.        Where did you reside prior to SCI Forest?

5   A.        At SCI Graterford.

6   Q.        How long were you at SCI Graterford?

7   A.        I believe less than six months.

8   Q.        So you would have arrived there some time

9   around October or November of 2013?

10  A.        Correct.

11  Q.        Where did you reside prior to SCI

12  Graterford?

13  A.        PICC Prison in Philadelphia.

14  Q.        When did you begin to reside at PICC?

15  A.        I was first incarcerated July 4th of 2012.

16  Q.        And from July 4th, 2012 to sometime in

17  October or November of 2013 you were at PICC?

18  A.        I'm sorry -- I'm sorry, 2000 -- this is

19  '15, last year is '14, '13.  I'm sorry, 2013 I

20  believe.

21  Q.        So you're saying you got to PICC on July

22  4th, 2013?

23  A.        Actually, I was arrested then.  It takes

24  several days to get to the prison.  So that's the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

1       day I was arrested though.

2       Q.        Some time in July 2013 you began your

3       incarceration at PICC; is that fair?

4       A.        Correct.

5       Q.        The incident that we're here for today,

6       that occurred on September 16th, 2013?

7       A.        Correct.

8       Q.        Did you graduate from high school?

9       A.        Yes, I did.

10      Q.        Where did you attend high school?

11      A.        I attended high school at Bensalem High

12      School in Bensalem, PA.

13      Q.        What year did you graduate?

14      A.        1990.

15      Q.        Do you have any education beyond high

16      school?

17      A.        I have an associates degree in business

18      management.

19      Q.        Where did you obtain your associates

20      degree?

21      A.        Ashworth College.

22      Q.        What year did you obtain your associates

23      degree?

24      A.        2006.

TROY LAMONT MOORE, SR.

1    Q.        Do you have any education beyond your

2    associates degree?

3    A.        No.

4    Q.        Did you have -- do you have any formal

5    training after 2006, formal education?

6    A.        Some education with Chevrolet.

7    Q.        What did you do with Chevrolet?

8    A.        I was a consultant and sales agent for two

9    major dealerships in Houston.

10   Q.        When was that?

11   A.        2011 to 2012.

12   Q.        Are you married?

13   A.        No, I am not.

14   Q.        Do you have any children?

15   A.        Two.

16   Q.        What was your last employment prior to

17   being incarcerated?

18   A.        I was a shift supervisor for an oil

19   refinery in North Philadelphia.

20   Q.        What was -- who was your employer?

21   A.        Neats Foot Oil Refinery.

22   Q.        Can you spell that?

23   A.        N-E-A-T-S, F-O-O-T, Oil Refinery.

24   Q.        And can you give me your dates of

TROY LAMONT MOORE, SR.

1    employment at the oil refinery?

2    A.        I believe January of 2013 to July of 2013.

3    Q.        You were employed by the oil refinery when

4    you were arrested?

5    A.        I just had resigned a week before.

6    Q.        I want to talk to you a little bit about

7    your criminal history.  My understanding is you were

8    convicted of robbery in 2002 --

9    A.        Correct.

10   Q.        -- is that correct?

11   A.        Yes.

12   Q.        How many years did you serve for that

13   conviction?

14   A.        Nine years, nine months, 26 days, 23 hours,

15   15 minutes, 20 seconds.

16   Q.        When were you released?

17   A.        I was released -- actually, I left the

18   state system on prerelease in 2011.

19   Q.        Where did you serve the majority of your

20   time for the 2002 conviction?

21   A.        At SCI Rockview.

22   Q.        How long did you spend at Rockview?

23   A.        Roughly seven and a half years.

24   Q.        And you were arrested again in 2013; is

1    that correct?

2    A.        That is correct.

3    Q.        And you pled guilty to robbery in 2014; is

4    that correct?

5    A.        Yes, sir.

6    Q.        And you're currently serving a 10 to 20

7    year sentence for that conviction?

8    A.        Yes, sir.

9    Q.        Have you been convicted of any other crimes

10   that we haven't talked about?

11   A.        No, just the robbery.

12   Q.        I want to talk to you to a little bit about

13   your medical history.

14             Do you -- did you have any health issues

15   prior to September 16th, 2013?

16   A.        Yes.

17   Q.        What kind of health issues did you suffer

18   from?

19   A.        I have a lower lumbar disability, which is

20   mainly handled through the VA, Veterans

21   Administration.  I have CAD, which is coronary

22   artery disease, which I am prescribed and take

23   Nitrostat Tabs PRN.  And also I have PTSD.

24   Q.        When were you first diagnosed with your

TROY LAMONT MOORE, SR.

1    lower lumbar disability?

2    A.        My best estimation would be '97.

3    Q.        And you've suffered with lower lumbar

4    issues ever since?

5    A.        Correct.

6    Q.        When were you first diagnosed with coronary

7    artery disease?

8    A.        I would say '98.

9    Q.        And have you continued to suffer from

10   coronary artery disease since 1998?

11   A.        Yes.

12   Q.        When were you diagnosed with PTSD?

13   A.        2012.

14   Q.        Do you know what the PTSD stems from?  Is

15   it from a certain incident?

16   A.        Yes.

17   Q.        What happened?

18   A.        Actually, it's an assault that happened

19   while I was in the military.

20   Q.        How long were you in the military?

21   A.        From 1990 to 1993.

22   Q.        And you were diagnosed with PTSD in 2012.

23   Was there any kind of incident that triggered from

24   the PTSD from the prior Army assault?

TROY LAMONT MOORE, SR.

14

1   A.          Actually, I was -- I was checked into a

2   mental institution --

3   Q.          Was that in 2012?

4   A.          -- slash hospital.  That was in 2012.

5   Q.          And what did they tell you at the hospital?

6   A.          They went over my history, and at that time

7   they diagnosed me with PTSD.

8   Q.          Has somebody told you that PTSD stems from

9   the assault in the Army when you were enlisted?

10  A.          In the marine corp, yes.

11  Q.          I'm sorry, the marine corp.

12              Who told you that?

13  A.          A doctor at the hospital I was -- I was at.

14  Q.          What hospital did you treat at?

15  A.          That was -- I can't remember the hospital's

16  name offhand, but it is in my medical records.

17  Q.          Do you have a copy of your medical records

18  from that hospitalization?

19  A.          To my understanding, we are not, as

20  inmates, allowed to possess medical records while

21  we're incarcerated.

22  Q.          I'm asking you whether you have access to

23  those records or not?

24  A.          I don't have access to them, but they're

TROY LAMONT MOORE, SR.

15

1    here because the institution actually sent it to the

2    hospital to acquire those records.

3    Q.        Understood.

4              Let's talk about the September 16th, 2013

5    incident.  Can you describe that incident in your

6    own words?

7    A.        Would you like me to go from start to end?

8    Q.        Well, let's start with -- my understanding

9    is there was an overflowing toilet in your cell; is

10   that correct?

11   A.        That is correct.

12   Q.        What caused the overflowing toilet in your

13   cell?

14   A.        I have absolutely no idea what caused it.

15   Basically that evening, approximately 23:15 hours, I

16   was sitting on a footlocker about to take off my

17   shoes and get prepared for bed.  Across the room

18   from the toilet, the water in the toilet absolutely

19   exploded covering me in raw sewage.

20             My first instinct was to get to the sink to

21   wash it out of my eyes and my mouth.  At that time I

22   also went through distress due to irregularities in

23   my heart beat, chest pains, shortness of breath.

24   Basically I banged on the door as long as I could to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

16

1   get the officer on duty to open the door so I could

2   get out of that situation and to no avail basically.

3   Q.        Let me back up a little bit.  It was not

4   the toilet in your cell that overflowed, it was the

5   toilet in the cell across from you; is that correct?

6   A.        No.  No.  No.  It was the toilet in my

7   cell.  I was sitting across the room from the

8   toilet.

9   Q.        Can you describe your cell as far as the

10  size of it?

11  A.        I think basically most cells are about the

12  same, eight and a half feet by -- eight and a half

13  by 13.  So I'm sitting on the opposite side of the

14  room from the toilet.

15            I just want to add that the burst out of

16  the toilet was so violent there was defecation four

17  feet high on the walls so...

18  Q.        What do you you mean by defecation?

19  A.        Human waste, solid human waste.

20  Q.        You were sitting on your footlocker near

21  the door to the cell; is that correct?

22  A.        That is correct.

23  Q.        And the toilet is on the other side of the

24  cell?

TROY LAMONT MOORE, SR.

1    A.          Correct.  Not long ways, short ways.

2    Q.          Did you have a roommate or a celly at the

3    time?

4    A.          I did at the time.  His name is

5    Mr. Bassamy.

6    Q.          Can you spell that?

7    A.          He was actually -- B-A-S-S-A-M-Y, first

8    name Gabriel.

9    Q.          And this is cell number 18; is that

10   correct?

11   A.          That is correct.

12   Q.          And it was in the G2 unit at PICC?

13   A.          That is correct.

14   Q.          Was Mr. Bassamy in the cell when the toilet

15   exploded?

16   A.          Yes, he was.  He also was contaminated with

17   raw sewage.  He was actually about to climb the

18   ladder to get on the top bunk.  So we were pretty

19   much in the same proximity.

20   Q.          Mr. Bassamy was not using the toilet at the

21   time; is that correct?

22   A.          No.  No one was using the toilet.

23   Q.          Did you look at the toilet at any point in

24   the day prior to this incident?

TROY LAMONT MOORE, SR.

18

1    A.        Yes, the toilet was working fine all day.

2    Q.        Did you observe anything in the toilet?

3    A.        I'm sorry?

4    Q.        Did you observe anything in the toilet that

5    was obstructing the toilet?

6    A.        No, not at all.

7    Q.        So as you sit here today --

8    A.        I also would like to add --

9    Q.        As you sit here today you have no idea why

10   the toilet exploded?

11   A.        No, I do not.  But I'd also like to add

12   that the cell directly next to ours overflowed also

13   that same night.  Throughout the night the toilet in

14   my cell overflowed approximately every 10 minutes

15   throughout the night until that next morning when

16   they brought emergency maintenance people on the

17   block.

18   Q.        The first time it overflowed was about

19   11:15 p.m.; is that correct?

20   A.        Yes, sir.

21   Q.        And it continued to overflow throughout the

22   night; that's your testimony?

23   A.        Yes, sir.

24   Q.        What time in the morning did -- you said

TROY LAMONT MOORE, SR.

19

1    repairmen came out to repair the toilet; is that

2    right?

3    A.        I'm sorry, one repairman came in the

4    morning.  Our doors were actually opened at -- I

5    believe at around 7 -- 07:30.

6            But I'd also like to add that because of

7    the constant overflowing all night, the correctional

8    officer, her name was Walden, she actually allowed

9    an inmate, a block worker, to come out of his cell.

10   She posted him outside of my cell door all night

11   just to mop so the raw sewage wouldn't go across the

12   tier into other cells.

13   Q.        Who was that inmate?

14   A.        I don't have his name.

15   Q.        What time were you let out of your cell the

16   next morning?

17   A.        I believe it was approximately 7:30.

18   Q.        Between the hours of 11:15 p.m. and 7:30

19   a.m. the next day did you speak to any PICC

20   employees other than Correctional Officer Walden?

21   A.        No.  The only person that I had contact

22   with is Correctional Officer Walden.  I continued to

23   bang on the door for the first hour after the

24   incident happened.  She continued to walk by and act

TROY LAMONT MOORE, SR.

20

1    like she couldn't hear me.

2              At that point, because I was in distress, I

3    had to actually lay down and try to calm myself down

4    because of the chest pains.  At that point my celly,

5    Mr. Bassamy, continued to bang on the door to no

6    avail.  The door was not opened, but she did let the

7    block worker out to clean and make sure that raw

8    sewage didn't spread.

9              And also the cell next to ours, she allowed

10   those inmates to evacuate their cell, clean their

11   cell and lock them back in, but we weren't allowed

12   to.

13   Q.        When you say the block worker, I'm a little

14   confused as to who that is.  Is that someone from a

15   different cell than yours?

16   A.        That is correct.  He was on the same tier

17   as me.  His job on the block was to sweep, mop,

18   clean showers during the day.  So he's, I guess you

19   would say, kind of like a trustee for the block.

20   He's a long-term incarcerated inmate in the county.

21   Q.        And you said that he was mopping the area

22   all night long?

23   A.        That is correct.

24   Q.        What time did he start mopping?

TROY LAMONT MOORE, SR.

1   A.        Approximately 10 minutes after the toilet

2   exploded.  She went down, she unlocked his door, he

3   came out and got the equipment and basically

4   squeegeed and mopped raw sewage into the drain

5   system.  And he did that all night to my knowledge.

6   Q.        At some point did you request medical

7   attention?

8   A.        I asked Officer Walden -- at that point I

9   was banging on the door letting her know that I

10  needed medical attention.  I was totally ignored.

11  She never even spoke to me.

12  Q.        Do you know Officer Walden's first name?

13  A.        No, I do not.  I'm assuming -- I believe we

14  had a difference in opinion as far as when we met

15  last time with the judge as to how to find Officer

16  Walden.  I believe that all officers are required to

17  log in and out.  So on that day during the overnight

18  graveyard shift that's the only person who was

19  there.

20  Q.        What time did you request medical attention

21  for the first time?

22  A.        Right away.

23  Q.        So around 11:30?

24  A.        Yes.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

22

1   Q.        Did you write up a sick call request at

2   some point?

3   A.        I actually did -- I believe over the next

4   week I probably submitted six or seven sick call

5   requests.  After the last one I was told by a

6   doctor, who normally does sick calls, that my sick

7   call request would no longer be accepted.

8   Q.        What doctor was that?

9   A.        I have no idea of what her last name is.  I

10  believe she is of Indian decent.

11  Q.        Well, I'm looking at the attachments to

12  your complaint.  It looks like this sick call

13  request that I'm looking at is labeled Exhibit 2A.

14            Do you have a copy of your complaint there?

15  A.        Not in front of me.

16  Q.        Do you recall making a sick call request,

17  and this one is dated September 17th, 2013?  It says

18  medical problem, be specific, you wrote shortness of

19  breath, throwing up, diarrhea, rash, facial and arms

20  due to exposure of raw sewage for several hours.

21            Is that familiar to you?

22  A.        Yes, sir.

23  Q.        Do you recall writing up that sick call

24  request?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

23

1    A.        Yes, sir.

2    Q.        The date on it, it has a 9, a dash and then

3    something written and scribbled out and then a 17

4    written over whatever was scribbled out.

5              Do you know what was written prior to it

6    being scribbled out and 17 being placed above it?

7    A.        To my knowledge there shouldn't be anything

8    scribbled on it.

9    Q.        Okay.  The date on it with the correction,

10   whatever it was, is 9/17/2013.  Is that the date

11   that you wrote this sick call request and submitted

12   it?

13   A.        I believe so, that would be the day after.

14   Q.        What time of day did you submit -- write it

15   and submit it?

16   A.        I'm not sure what time of day it was.

17   Q.        Could you tell me whether it was the

18   morning, the afternoon, the evening?

19   A.        I cannot give you a specific -- when it

20   was.

21   Q.        That sick call request was your first sick

22   call request that you prepared after this incident;

23   is that correct?

24   A.        It happened on the 16th, yes, I would

TROY LAMONT MOORE, SR.

24

1    concur with that.

2    Q.       When did you start experiencing shortness

3    of breath?

4    A.       During the incident.

5    Q.       How soon after the incident did you have

6    shortness of breath?

7    A.       I would say when the chest pain started.

8    Q.       When did the chest pain start?

9    A.       Pretty much right after the incident

10   happened while I was at the sink.

11   Q.       So maybe a few minutes afterwards, a few

12   hours afterwards?

13   A.       A few minutes.

14   Q.       It also -- the sick call request also says

15   that you were throwing up.  When did you throw up?

16   A.       I threw up in the cell.  And also I have

17   periods of throwing up, vomiting days following.

18   Q.       When did you stop throwing up?

19   A.       It wasn't more than maybe four days.

20   Q.       You were throwing up for four days?

21   A.       Not constantly.  Periods, yes.

22   Q.       So this incident happened on the night of

23   the 16th.  Is it your testimony that you threw up on

24   the 16th, the night of the 16th, the 17th, the 18th

1    and the 19th?

2    A.        That is correct, sir.

3    Q.        When did you start experiencing diarrhea?

4    A.        I would say the night -- the night -- the

5    evening of the 17th.

6    Q.        How long did you have diarrhea?

7    A.        I believe two days.

8    Q.        And you also said that you had a rash.  Can

9    you tell me about the rash?

10   A.        I had patches of rashes from my scalp all

11   the way down my body, which the medical department

12   examined.

13   Q.        Now, you kind of just said that you had

14   rashes covering your body.  Was that your entire

15   body?

16   A.        Not the entire body, but in patches, yes.

17   From my scalp all the way down including athlete's

18   feet (sic), rash on my feet.

19   Q.        Did the -- did this incident cause you to

20   have athlete's foot?  Is that your understanding?

21   A.        I would say yes because I didn't have any

22   foot fungus prior to this incident.  My best

23   assumption would be from actually standing in an

24   inch of raw sewage is probably what caused that, not

TROY LAMONT MOORE, SR.

1    to mention, I was soaked in it.

2    Q.        There was one inch of raw sewage in your

3    cell?

4    A.        Exactly.  What happens is, those cells --

5    the layout of those cells, they're slanted.  So if

6    something overflows, the cell actually fills up

7    about an inch before gravity will push anything out

8    under the door.  So it was about maybe an inch of

9    raw sewage on the floor, which I was ordered to

10   clean up the day after with no protective gear.

11   Q.        Did you follow that order and clean it up?

12   A.        I did.  I followed that order.  I actually

13   cleaned the cell before they allowed me to take a

14   shower to get the raw sewage clothes off of me.

15   After that I was allowed to proceed to medical.

16   Q.        What time did you proceed to medical?

17   A.        I would assume it would be around 9

18   o'clock.

19   Q.        9 a.m. on September 17th you went to

20   medical?

21   A.        That is correct, sir.

22   Q.        Can you tell me about your treatment at

23   medical?

24   A.        Okay.  I proceeded to medical.  Once I got

TROY LAMONT MOORE, SR.

1    there I let them know that I was in distress.  I had

2    chest pains, shortness of breath.  I sat in the

3    waiting room.

4              Approximately 15 minutes later I was called

5    to the next corridor where one of the defendants'

6    nurse, RN McGrogan, came over to me.  I explained to

7    her that I had CAD.  At that point I requested a

8    Nitrostat Tab.  She then proceeded to put a finger

9    monitor on my finger and walked away from me.

10             Approximately two minutes passed by, she

11   came down, she took the finger monitor off.  I asked

12   her again for a Nitrostat Tab and her exact words

13   were, you're wasting my time.  And she ordered me

14   back to the block.

15   Q.        Did you receive any other treatment while

16   you were at medical other than what you just

17   described?

18   A.        Absolutely none.

19   Q.        Did you return to medical at any point?

20   A.        The only time I went back to medical was

21   right before I was being transferred upstate and

22   that was for checking out purposes.

23   Q.        When were you transferred upstate?

24   A.        I believe November 11th of 2013.

TROY LAMONT MOORE, SR.

28

1    Q.        So if I understand you correctly, between

2    September 17th, 2013 and November -- November 7th,

3    2013 you did not see a medical professional at PICC?

4    A.        No, I did see a medical professional.  It

5    just wasn't in the medical department.  From filling

6    out the sick call slips they would call me over to

7    the mini triage which is right outside the block.

8             In those sessions describing the fungus on

9    my feet, the rashes, the stomach problems, the

10   violent vomiting, the severe headaches for I would

11   say probably weeks, they treated me for those

12   things.

13            For the fungus they gave me fungal cream.

14   For the violent vomiting they gave me antacids for

15   my stomach.  For the chronic headaches they gave me

16   aspirin.  Actually I saw someone, but it just wasn't

17   in the medical department.

18   Q.        Was the person you saw at the medical

19   triage, was that a nurse?

20   A.        I believe she was a doctor.

21   Q.        You saw a medical doctor?

22   A.        This is the same -- I'm sorry.  This is the

23   same person that told me my sick call requests would

24   no longer be honored.

TROY LAMONT MOORE, SR.

1    Q.        Do you know who that person is?

2    A.        I do not know her name.  She is of Indian

3    decent.

4    Q.        And your understanding is that that's a

5    medical doctor?

6    A.        Yes.

7    Q.        Did you receive any diagnoses from the

8    doctor or the nurse that you saw?

9    A.        No, I did not, other than just saying that

10   these are minor problems.

11   Q.        I'm going to move onto your grievances.  Do

12   you have a copy of your grievances that you filed?

13   A.        Not in front of me.

14   Q.        I'm looking at Exhibit Number 1 from your

15   complaint.  Attached is a grievance.  The grievance

16   is dated, September 17th, 2013.

17             Do you recall submitting a grievance on

18   September 17th, 2013?

19   A.        Yes, sir.

20   Q.        Just to summarize the grievance, it appears

21   to be involving the overflowing toilet in your cell.

22   And you mentioned shortness of breath, vomiting,

23   diarrhea, rash as a result of the overflowing

24   toilet.

TROY LAMONT MOORE, SR.

30

1          Are you familiar with that grievance?

2     A.     Yes, sir.

3     Q.     Was that the first grievance you submitted

4     following this incident?

5     A.     Yes, sir.

6     Q.     Is this grievance grieving any particular

7     employee at PICC?

8     A.     You're asking me if it's grieving any

9     particular person?

10    Q.     Yes.

11    A.     I don't have the grievance in front of me.

12    Q.     Do you recall who this grievance was

13    directed at, if anybody?

14    A.     I would venture to say that the issue

15    started with CO Walden.

16    Q.     I'll represent to you that Correctional

17    Officer Walden is not mentioned in this grievance.

18    Nowhere in this grievance does her name appear.

19    A.     Okay.

20    Q.     Do you recall writing a grievance with

21    Correctional Officer Walden's name?

22    A.     I believe I did.  I just don't know which

23    one.

24    Q.     I'm going to move onto the next page of the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

1   Exhibit 1.  It appears to be another grievance that

2   you filed.  It's dated October 4th, 2013.

3          Can you explain to me why you submitted the

4   second grievance?  It talks about how the first

5   grievance wasn't remedied.  So can you explain that?

6   A.        Actually there was -- they never even

7   answered the first grievance.  There was no

8   response.

9   Q.        Okay.  This second grievance dated October

10  4th, 2013, did you file this because you did not get

11  a response to your first grievance?

12  A.        Would you care to read the grievance to me?

13  Q.        Sure.  I declare or certify, verify or

14  state under the penalty of perjury under the laws of

15  the United States of America that the foregoing is

16  true and correct.  This is in reference to a

17  previous grievance filed.  The grievance was

18  reviewed by Major Martin and only partially

19  remedied.

20          Part 1 of the action, requested medical

21  needs was initiated.  However, part 2, action

22  requested procedural amendment to ensure no

23  reoccurrence was inadequately addressed.  I'm

24  formally requesting that this continuation grievance

1   be appealed in order to be reviewed by the

2   superintendant at the next grievance level seeing

3   that the initial grievance was not reviewed by a

4   board.

5   A.       Okay.  I believe in the rules and

6   regulations of filing grievances, the grievance is

7   supposed to be submitted to a board.  That was not

8   done.  Also I asked for a procedural amendment so

9   this doesn't happen again.

10          There is absolutely nothing in place at

11   that level at PICC to ensure that other inmates

12   don't have to go through this.

13   Q.       Where is your procedural amendment?  Is

14   there a procedure proposed?

15   A.       No, I do -- what I was looking for was to

16   come up with some common ground to submit a

17   procedural amendment.

18   Q.       You never got to the stage of actually

19   submitting one; is that correct?

20   A.       No, at every level the grievances were

21   brushed off as -- there was no action taken.

22   Q.       There's a few parties in this lawsuit, and

23   I'm going to talk to you about them in a little bit.

24   You have sued Commissioner Giorla.

TROY LAMONT MOORE, SR.

1          Can you tell me about your interaction with

2    Commissioner Giorla, if there was one?

3    A.          Okay.   After all three grievance levels

4    were pursued per the rules and regulations of

5    submitting grievances in this process, I personally

6    spoke to Commissioner Giorla about the situation.

7    Absolutely no action was taken.

8    Q.          When did you speak with Commissioner

9    Giorla?

10   A.          I believe three or four days after the

11   incident occurred.   He was actually at PICC and I

12   spoke to him candidly.   If need be, I guess it can

13   -- the video can be retrieved because it was in shot

14   of a camera.   So...

15   Q.          Where did you speak with Mr. -- or

16   Commissioner Giorla?

17   A.          On the G2 block.

18   Q.          What time was it when you spoke with him?

19   A.          I would say approximately 10:00 or 11:00 in

20   the morning, a.m.

21   Q.          And it was either on September 19th or

22   September 20th; is that correct?

23   A.          I believe so.

24   Q.          What did you say to Commissioner Giorla?

TROY LAMONT MOORE, SR.

34

1    A.        I explained the entire situation that had

2    happened.  I also explained that I had submitted

3    grievances trying to get some resolution.  His

4    response to the whole conversation was that his

5    officers are to handle things at their level,

6    meaning it's not his concern.

7    Q.        What did you ask Commissioner Giorla to do?

8    A.        To look into the situation and hopefully

9    find a remedy.

10   Q.        Did you propose a remedy to Commissioner

11   Giorla?

12   A.        No, I did not.

13   Q.        What exactly were you looking for him to

14   do?

15   A.        To actually put something in place where

16   this type of incident doesn't have to happen again.

17   For one, he already stated that his guards are to

18   handle it at their leisure at that level.

19            My whole thing is, just when they had the

20   meeting in Major Martin's office, the first thing

21   she did when she found out about the situation, she

22   ordered one of her guards to pull the videotape

23   immediately.  Okay.

24            Her first instinct was to let me know that

TROY LAMONT MOORE, SR.

35

1   at that time of night, after 23:00 hours the guard

2   can't open doors for anyone.  But the video footage

3   obviously will contradict that.  Because not one,

4   but two cells were open for cleaning purposes.

5           So everyone is given the same runaround

6   here.  And I looked towards Commissioner Giorla to

7   rectify this situation so this type of thing doesn't

8   happen anymore.  And he basically brushed it off.

9   Q.        What does Commissioner Giorla look like?

10  A.        He's quite heavyset.  He's shorter than me.

11  I'm 6'3" and three-quarters.  So he's approximately

12  -- I would say 5'9", very heavyset man.

13  Q.        How old is he?

14  A.        I would venture to say in his late 40s,

15  early 50s.

16  Q.        What color is his hair?

17  A.        That I don't remember.

18  Q.        Does he wear glasses?

19  A.        At that time I don't remember him having

20  glasses on.

21  Q.        What was he wearing when you spoke with

22  him?

23  A.        He was wearing a button up shirt, dress

24  shirt and slacks.

TROY LAMONT MOORE, SR.

36

1   Q.        Was he in uniform?

2   A.        No, he was not.

3   Q.        I want to talk to you about Major Martin.

4   Can you tell me your interaction with Major Martin?

5   A.        Basically at the second level of the

6   grievance system I was called to Major Martin's

7   office.  To my understanding, she serves on the

8   grievance board at that level.

9            Once the correctional officer picked me up

10  from the block and escorted me to her office I went

11  inside.  She asked me what the situation was.  I

12  explained to her in great detail about the cell

13  overflowing, the toilet overflowing, not being able

14  to get medical attention that night until the next

15  morning, where I still didn't get medical attention,

16  the medical issues that were going on.

17           She, at that point, ordered the guard that

18  escorted me to go and remove the tape and preserve

19  the tape.  She said she would look into things.  I

20  never heard anything else at that level from her.

21  Q.        When did you speak with Major Martin?

22  A.        I don't recall what day it was.

23  Q.        Do you know how many days after this

24  incident you spoke with Major Martin?

TROY LAMONT MOORE, SR.

1   A.        It may have been two to three weeks

2   afterwards.

3   Q.        You first spoke with Major Martin two to

4   three weeks after this incident?

5   A.        I believe so.

6   Q.        So you spoke with Commissioner Giorla prior

7   to speaking with Major Martin?

8   A.        That is correct.

9   Q.        You had a meeting with Major Martin in her

10  office?

11  A.        That is correct.

12  Q.        Where is her office?

13  A.        I couldn't give you a floor plan.  I don't

14  -- that's my first time in PICC.  So all I know is

15  how to get to the block, but I was escorted, so...

16  Q.        Is Major Martin's office in PICC?

17  A.        Yes, it is.

18  Q.        You didn't have to go outside to get there?

19  A.        No.

20  Q.        You said that Major Martin told you she was

21  going to pull the video?

22  A.        She instructed the escorting officer to

23  immediately pull and preserve the video.

24  Q.        When you are referring to a video, what

TROY LAMONT MOORE, SR.

38

1    video camera are you talking about?

2    A.       The video camera that is on G2 unit.

3    Q.       How many video cameras are on G2?

4    A.       I'm not sure.

5    Q.       Did you see a video camera on G2?

6    A.       Yes.

7    Q.       How many video cameras did you see?

8    A.       I know of one.  There's definitely one.

9    Q.       Where is the one that you know of?  Where

10   is that located on G2?

11   A.       The front half of the block.

12   Q.       So there's one video camera on the front

13   half of the block that faces down the hallway of the

14   cells; is that correct?

15   A.       It actually faces the front of the cells

16   excluding the corridor, which is at the back of the

17   block.  So the video footage would absolutely,

18   definitely show that I was banging on the door, that

19   other inmates were let out, that my cell was

20   overflowing all night, which is why it's imperative

21   that I examine that evidence.

22   Q.       I think you referenced that you requested

23   the video be preserved.  When did you make a request

24   that the video be preserved?

TROY LAMONT MOORE, SR.

1    A.        That -- at that meeting with Major Martin.

2    Q.        Was that requested in writing?

3    A.        No, it was not.

4    Q.        Do you have a copy of any requests you made

5    to preserve the video of this incident?

6    A.        Absolutely not.  It was verbal from me to

7    her and it was verbal from her to her CO.

8    Q.        What does Major Martin look like?

9    A.        She's an African American woman.  I would

10   probably say in her late 40s, early 50s.  Her office

11   is very small.  It's actually crowded by a desk that

12   probably takes up most of the office.

13   Q.        Can you describe her build?

14   A.        She is shorter than me.  I would probably

15   say maybe 5'5, 5'6".  Medium build.  She's not

16   heavyset and she's not thin.

17   Q.        I don't think you mentioned with

18   Commissioner Giorla, what race is he?

19   A.        He's Caucasian.

20   Q.        Correctional Officer Walden, you talked

21   already about when you came into contact with that

22   officer.  Is she a female officer?

23   A.        Yes, she is.

24   Q.        Can you give me a physical description of

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

40

1    Correctional Officer Walden?

2    A.         She's an African American woman.  I would

3    put her taller than Major Martin.  So she's probably

4    about 5'9", 5'10".  Probably early to mid 50s.

5    She's a little bit older.  Very thin build.

6    Q.         Who is Larry Rodriguez?

7    A.         Larry Rodriguez is another inmate who was

8    incarcerated at the same time I was on G2.  He

9    actually -- several inmates actually witnessed the

10   overflowing of the raw sewage coming from my cell

11   out onto the tier.

12             His cell was in proximity where he could

13   see the front door of my cell.  That is why I

14   ascertained an affidavit from him.

15   Q.         Do you know what cell number he was in?

16   A.         Not cell number.  I can't recall the

17   number.

18   Q.         But you said he was across from you?

19   A.         Actually, it's on the upper tier.  It's the

20   last cell, which would be the closest to the CO's

21   desk upstairs.  So his --

22   Q.         Could he see inside your cell?

23   A.         Inside, I wouldn't say that, no.  He could

24   see -- he can see my window and he can see the

TROY LAMONT MOORE, SR.

1   bottom of the door.  But as far as visual, inside

2   the cell, I wouldn't think so.

3   Q.        Did you talk to Mr. Rodriguez before he

4   prepared this affidavit?

5   A.        I believe the only thing that I said to him

6   was I would like to ascertain an affidavit from you,

7   if you could write down exactly what you saw and

8   what time it was, and that's what he did.

9   Q.        You didn't give Mr. Rodriguez any

10  information before he prepared this affidavit?

11  A.        I don't believe so.

12  Q.        Is Mr. Rodriguez a friend of yours?

13  A.        No.  I had probably known him -- at that

14  point I had probably known him maybe two weeks.

15  Q.        Is there a reason you asked Mr. Rodriguez

16  to prepare an affidavit as opposed to someone else?

17  A.        Because of the position of his cell.

18  Q.        Because he was above your cell?

19  A.        Because he could see the front of my cell

20  from his cell.

21  Q.        Who is Rodney Johnson?

22  A.        He's another gentleman who was incarcerated

23  at the same time.  He was living on G2 with me.  His

24  cell is actually on the lower tier across from my

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

42

1    cell.

2                        MR. SHOTLAND:  The other attorney

3           who is here might have a couple questions

4           for you.  I might have a couple after he's

5           done.  Thank you for your time and I'll let

6           him go.

7                        THE WITNESS:  Okay.  Thank you.

8    BY MR. FERRANTE:

9    Q.        Good afternoon, Mr. Moore.  My name is

10   Alexander --

11   A.        Good afternoon.  How are you, sir?

12   Q.        I'm fine.  Can you hear me okay?

13   A.        Actually, I can barely hear you.  Hold on

14   one second.

15   Q.        Mr. Moore, my name is Alexander Ferrante.

16   I represent Nurse McGrogan and I have a few

17   questions for you.

18                 What are all those documents you have in

19   front of you?

20   A.        Actually, I have a presentation for the

21   opening statement I gave.  I also have some legal

22   documentation, case law as to what can be done and

23   what can't be done.  And then I have several

24   documents as far as what's been filed and what

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

1   hasn't.  And also things from the medical department

2   and denying me access to contact both counsel for

3   the defendant.

4   Q.      Did you bring with you your complaint?

5   A.      No, I did not.

6   Q.      What legal documents did you bring then?

7   A.      The ones I just described to you.

8   Q.      You haven't described any to me.

9           What legal documents are sitting in front

10  of you?

11  A.      Okay.  I have the order from the judge

12  granting a motion to compel.

13  Q.      Excuse me, Mr. Moore --

14  A.      I have a notice of --

15  Q.      Mr. Moore, let's go back to that.  Go back

16  to that order.  What's the date of that?

17  A.      Third day of December, 2013.

18  Q.      What else do you have?

19  A.      I have notice of deposition from you.  I

20  also have the video conference order.  I have the

21  first scheduling order and also the pretrial

22  conference and hearing on my motion to the judge.

23  Q.      So you knew we were going to take your

24  deposition today?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

44

1   A.        Yes, which I objected to.

2   Q.        And although you knew we were going to take

3   it, you chose not to bring the copies of your

4   grievances or a copy of your complaint?

5   A.        I wasn't instructed to bring those things.

6   Q.        Well, you weren't instructed to bring what

7   you've brought with you today, you still brought

8   them.

9   A.        Correct.

10  Q.        Did you -- do you have any personal notes

11  at all about what took place on September 16th or

12  the 17th?

13  A.        Personal notes?

14  Q.        Yes.  Did you take down any notes, write

15  anything down on paper?

16  A.        No.

17  Q.        Keep a diary at all?

18  A.        No, all I have is my original complaint.

19  Q.        Let's talk about the night of September

20  16th.  You said you were near the footlocker --

21  sitting on the footlocker, there was an explosion,

22  stuff comes all out of the toilet.  I want to start

23  from that moment.  Okay?

24  A.        Yes, sir.

TROY LAMONT MOORE, SR.

1   Q.        When did it stop coming out of the toilet?

2   A.        It didn't because it continuously

3   overflowed.  Every 10 minutes it would overflow.

4   Q.        That leads me to believe at one point it

5   has to stop in order for it to continue?

6   A.        That is correct.

7   Q.        So when did it first stop?

8   A.        It overflowed for approximately 15 to 20

9   seconds and then it would stop.

10  Q.        Now, during that first time, that 15 or 20

11  seconds when it overflowed you were near your

12  footlocker?

13  A.        Correct.

14  Q.        Now, after it stopped, did you clean

15  yourself up?

16  A.        The only thing I did was I washed the raw

17  sewage out of my face.

18  Q.        Did you wash your hands?

19  A.        I rinsed my hands.

20  Q.        Did you change clothing?

21  A.        No, I did not.

22  Q.        Well, it's September, it's in the prison,

23  were you just wearing your boxers?

24  A.        Actually, I was about to get undressed for

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

TROY LAMONT MOORE, SR.

1    bed.  I was sitting on the footlocker taking off my

2    shoes when the toilet exploded.  And at that time I

3    only had one set of prison uniform and one pair of

4    sheets.  Might I add, I had to sleep on those soiled

5    sheets for two days before I could get them changed.

6    Q.        Now, since you saw that the footlocker --

7    I'm sorry, since you saw that the toilet exploded, I

8    would imagine you kept your shoes on?

9    A.        Actually I did.

10   Q.        Now, did you keep them on for the rest of

11   the evening until the early morning?

12   A.        No, I did not because the raw sewage had

13   seeped down into the shoes.

14   Q.        Well, we talked about the first incident,

15   there was a 15 second burst, it stopped.  When did

16   the next one happen?

17   A.        Approximately 10 minutes later.

18   Q.        How long did that last?

19   A.        About the same length in time, but granted

20   when other toilets would flush on the upper tier,

21   our toilet would overflow in between those intervals

22   of 10 minutes.

23   Q.        So did you put anything over the toilet to

24   stop it from overflowing?

TROY LAMONT MOORE, SR.

1   A.        Absolutely not.

2   Q.        Did you put anything into the toilet to try

3   to clog it up?

4   A.        Absolutely not.

5   Q.        Now, how many inches off the floor is the

6   first bunk bed?

7   A.        I would estimate maybe a foot and a half,

8   two feet.

9   Q.        So if someone is sitting on the first bunk

10  bed you wouldn't be in the raw sewage?

11  A.        That's correct.  You wouldn't be in the raw

12  sewage.

13  Q.        Is there a reason why you didn't stay on

14  the bed?

15  A.        Once the incident happened I was actually

16  covered in sewage.  So me laying down in bed, which

17  I eventually did being in distress, I was still

18  covered in raw sewage.

19  Q.        That's not my question.

20            Why wouldn't you just stay in bed so your

21  feet wouldn't be in it?

22  A.        The reason for that is because I was

23  banging on the door trying to get CO Walden's

24  attention to open the door because I was in distress

TROY LAMONT MOORE, SR.

48

1    and needed medical attention.

2    Q.        After that didn't work, why didn't you just

3    stay in the bed?

4    A.        I did.

5    Q.        So was there only one time you left the bed

6    to go over to the cell door and try to get her

7    attention?

8    A.        Once that incident happened I banged at the

9    door.  The banging lasted about maybe 45 minutes to

10   no avail.  After that I sat on my bunk in the bed

11   covered in raw sewage, yes.

12   Q.        So we're talking about a time period from

13   11:15 to about 7:30 in the morning, correct?

14   A.        That is correct.

15   Q.        During that entire time there was a period

16   of 10 to 15 minutes that you tried to get someone's

17   attention?

18   A.        I'm sorry, can you repeat the question?

19   Q.        Well, from 11:15 to 7:30 you told us that

20   you were sitting on the bed except for about 10 to

21   15 minutes where you were trying to get someone's

22   attention at the door?

23   A.        That's incorrect.

24   Q.        What's incorrect about it?

TROY LAMONT MOORE, SR.

1    A.         I stated that for 45 minutes I tried to get

2    her attention at the door.  After that time I sat in

3    my bunk.  The toilet overflowed every 10 minutes.

4    Q.         How long were you at the door total trying

5    to get her attention?

6    A.         I was at the door for about 45 minutes and

7    then my cellmate, Mr. Bassamy, took over.

8    Q.         Mr. Moore, what medications are you on

9    today?

10   A.         I'm on an aspirin a day for my heart.  I am

11   on Nitrostat Tabs, which is Nitroglycerin, which is

12   PRN for my CAD and I'm also on Risperdal.

13   Q.         Are you on Zantac at all?

14   A.         No.

15   Q.         What was the Zantac for?

16   A.         Zantac?

17   Q.         Yes.

18   A.         When was that administered?

19   Q.         Well, that was administered as soon as you

20   got to the prison in July of 2013 and it continued.

21   A.         Do you know what that medication is for?

22   Q.         It's a mental health medication.  Do you

23   have a mental health problem?

24   A.         I do.  I have PTSD.  That medication was

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

50

1    probably given -- it's just my assumption that the

2    medication was given until I actually got to my

3    jail.  They did a reassessment, and I'm on Risperdal

4    now.  I'm also on 90, 600 milligram Motrin per month

5    for back issues.

6    Q.        Mr. Moore, let's talk about that evening.

7    Before we get there, the mental hospital that you

8    were in in 2012, do you remember the name of that?

9    A.        Now I do.  It was Cypress Hill (sic) and

10   that is in Houston, Texas.

11   Q.        Now, you went down to medical -- I think

12   you said around 9:00 a.m. that morning on the 17th?

13   A.        I believe so.

14   Q.        Had you taken a shower yet?

15   A.        They allowed me to take a shower before I

16   went to medical.

17   Q.        So you were able to get cleaned up?

18   A.        Correct.

19   Q.        Did they give you a new uniform?

20   A.        Yes, they did.

21   Q.        Now, did you walk down to medical?

22   A.        Yes, I did.

23   Q.        So at 9:00 a.m. you were able to walk on

24   your own without having any problems?

TROY LAMONT MOORE, SR.

1    A.        Correct.  I would also like to add that

2    without submitting proper work to go to sick call

3    down in medical, there's only a limited amount of

4    reasons that they would allow you to go directly

5    from the block to medical without the paperwork.

6              One being in distress, another bleeding

7    from an altercation, heart attack, stroke, only

8    those types of emergencies are allowed to be

9    processed directly from the block to medical.

10   Q.        Now, in an emergency situation you would be

11   escorted -- a prisoner is escorted to medical; isn't

12   that true?

13   A.        I don't know what their procedure is.

14   Q.        Do you think this was an emergency

15   situation?

16   A.        Well, I was in distress and I do have a

17   history of heart problems.

18   Q.        Well, that wasn't my question.

19             Did you think this was an emergency

20   situation?

21   A.        Yes.  Obviously if they allowed me to go to

22   medical.

23   Q.        No.  No.  I want your opinion right now.

24             You went to medical because you wanted to

TROY LAMONT MOORE, SR.

1    go to medical, so they sent you down.

2            Were you having an emergency?  That's a yes

3    or no question.

4    A.       I will answer it like this --

5    Q.       I want an answer yes or no and then you can

6    explain your answer.

7    A.       I was ordered to medical, yes.

8    Q.       Now, when you got down to medical were your

9    vital signs taken?

10   A.       A finger monitor was placed on my finger.

11   Q.       Let me ask you again.  Do you know what

12   vital signs are, Mr. Moore?

13   A.       I'm not a medical professional, so when you

14   say vital signs, I don't know what you're talking

15   about.

16   Q.       As you sit here today, being in the

17   hospitalizations you've had in the past, you don't

18   know what vital signs are, that's what you're

19   telling the jury?

20   A.       Are you talking about heart rate, blood

21   pressure -- blood pressure wasn't taken.  No medical

22   attention was given besides a finger monitor.

23   That's what I'm telling you.

24   Q.       Would taking your blood pressure have been

TROY LAMONT MOORE, SR.

1    a good thing or a bad thing?

2    A.        It would have been a good thing if it was

3    administered.

4    Q.        Well, your blood pressure was 110 over 80

5    that day.  It was taken that morning by

6    Ms. McGrogan.

7              Did you know that?

8    A.        If that's what the finger monitor does, I

9    would guess that that's what it does.

10   Q.        Do you know what your oxygen rate was?  Do

11   you know what oxygenation is?

12   A.        I absolutely do not.

13   Q.        Your pulse oxygenation rate was 97 on room

14   air.  I'm letting you know that so you can look it

15   up when you go back to your cell to try to find out

16   what that meant.  Because I think right now you have

17   no idea what these medical records show what they

18   did for you that day.

19             What's your respiration?  Do you know what

20   your respiration rate was?

21   A.        No, I do not.

22   Q.        What about your pulse rate?

23   A.        Well, I do know what a pulse is.  It's

24   amazing to me that you can tell all these things

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

1    from a finger monitor.  Because that's all the

2    entire medical visit consisted of.

3    Q.        When you got down to medical they did an

4    exam on you and they found no shortness of breath.

5              Do you know what shortness of breath is?

6    A.        Absolutely I do.

7    Q.        Were you having shortness of breath at 9:00

8    or 9:30 a.m.?

9    A.        I was.

10   Q.        Were you having a rash at 9:00 or 9:30 a.m.

11   that morning?

12   A.        At -- that morning the rash hadn't started

13   yet.

14   Q.        Were you complaining of chest pain at 9:00

15   to 9:30 in the morning?

16   A.        I was.

17   Q.        Can you explain how you can have chest

18   pain, but have a normal oxygen rate and a normal

19   pulse rate?

20   A.        No, I cannot.

21   Q.        Were you vomiting that morning in the

22   medical department?

23   A.        Not in the medical department, no.  The

24   visit was very short.

TROY LAMONT MOORE, SR.

55

1    Q.        So in the medical department there was no

2    vomiting going on?  No diarrhea?

3    A.        No, I did not vomit.

4    Q.        Any diarrhea in the medical department?

5    A.        Not in the medical department, no.

6    Q.        Any complaints of headaches in the medical

7    department?

8    A.        Yes, I did tell her about the headaches.

9    And I also explained it was probably breathing the

10   raw sewage for over eight hours.

11            I do have a question.  How can -- how is it

12   possible to determine oxygen in the blood with a

13   finger monitor?

14   Q.        In your complaint you list a bunch of

15   things that -- a bunch of your injuries.  It's on

16   page 3.

17            Do you realize that headaches was not one

18   of the things that you complained about?

19   A.        It may not have been.  I also have

20   something to add.  If the headaches or the vomiting,

21   stomach problems weren't there, why was the medical

22   department prescribing medication to treat it?

23   Q.        When did you go back to medical?

24   A.        I was basically going -- dropping a sick

TROY LAMONT MOORE, SR.

1    call slip every day.

2    Q.       Well, do you remember going back?

3    A.       I never went back to the medical

4    department.  I went to the triage, which is right

5    out of the block.

6    Q.       When was the next time you had any type of

7    medical treatment?

8    A.       I believe the following day.

9    Q.       And who treated you then?

10   A.       The doctor on duty.

11   Q.       By that time was your cell cleaned?

12   A.       Yes, I was ordered to clean the cell before

13   I could even go to medical that day.

14   Q.       So it had been cleaned by the time you left

15   at 9 o'clock?

16   A.       That is correct.

17   Q.       Any trouble cleaning the cell?

18   A.       Just basically exposing myself further to

19   the raw sewage with no protective gear.  To my

20   understanding, that prison officials are supposed to

21   have designated HAZMAT people to clean up bodily

22   fluids, which did not happen.

23   Q.       But you had no trouble physically cleaning?

24   A.       Sure there was trouble.

TROY LAMONT MOORE, SR.

1    Q.        Did you have a mop?

2    A.        No, I did it on my hands and knees.

3    Q.        What about your roommate, did he do it on

4    his hands and knees too?

5    A.        No.  At 7:30, when they cracked the doors

6    to let us out, he was summoned on a path to

7    somewhere.  So I had to do everything myself.

8    Q.        Now, the next day you had some medical

9    treatment.  And do you remember having your vital

10   signs taken that day?

11   A.        No, I do not remember per se.

12   Q.        You were complaining that your stomach was

13   upset.

14   A.        Okay.

15   Q.        Does that refresh your memory at all?

16   A.        I believe my stomach was upset at that

17   point.

18   Q.        They asked you if you have shortness of

19   breath and you said no --

20   A.        The following day you're talking about?

21   Q.        Yes.

22   A.        You're talking about the 18th?

23   Q.        I'm talking about the 18th.  That's the

24   following day; isn't it?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

58

1   A.        It is the following day.

2   Q.        And you weren't complaining of shortness of

3   breath then?

4   A.        Okay.  If that's what it says, that's what

5   it says.

6   Q.        Don't you remember -- you have no memory of

7   the following day what your symptoms were?

8   A.        You're asking -- what you're doing is

9   you're asking me to remember something from a year

10  and a half ago to today.  Is that what you're

11  asking?

12  Q.        I'm asking what symptoms in this traumatic

13  event in your life you were having the next day?

14  A.        Okay.  I was having stomach problems.  I

15  was still vomiting.  I was having diarrhea and

16  severe headaches.

17  Q.        You weren't having chest pains, you weren't

18  having shortness of breath?

19  A.        No.  The next day, which was the 17th,

20  which would be the day before, chest pains subsided

21  that afternoon even though I was denied the

22  Nitroglycerin.

23  Q.        The chest pain subsided on the afternoon of

24  September 17th?

TROY LAMONT MOORE, SR.

59

1    A.        17th, correct.

2    Q.        When did you have any other medical

3    treatment for any other reason -- for any reason by

4    any provider?

5    A.        I was seen several days in a row for the

6    athlete's foot, for the rashes.  I was prescribed

7    the antifungal cream.  I was given Motrin for the

8    headaches.  I was given antacids for the stomach

9    problems for several days after until I was informed

10   by the doctor -- my sick call request would no

11   longer be accepted.

12   Q.        You had a sick call and you were seen on

13   September 23rd for your feet.  You had another sick

14   call and you were seen on March 23rd.  You were

15   discharged from this prison to Graterford on

16   November -- it looks like November 13th.

17             Does that correspond with your memory?

18   A.        Pretty much.

19   Q.        What is it you wanted Nurse McGrogan to do

20   for you that morning?

21   A.        It's what she didn't do.  She didn't

22   provide me any medical care.

23   Q.        So you wanted her to provide you with

24   medical care?  That's what you wanted?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

1   A.         Correct.

2   Q.         She didn't think medical care, other than

3   what she did, was necessary.  You have a difference

4   of opinion?

5   A.         Correct.

6   Q.         And what's the basis of your difference?

7   What more was it that you wanted her to do?

8   A.         For one, she was informed by me that I take

9   Nitroglycerin.  That was denied.

10  Q.         Well, you had no shortness of breath.  She

11  thought medically you didn't need it.  There was no

12  complaints of chest pains.  There was no shortness

13  of breath.  Your oxygenation was normal.  Your pulse

14  rate was normal.  You blood pressure was normal.

15  A.         That's absolutely incorrect because I

16  informed her of the chest pains.  And like I stated

17  for the record before, the only thing that was done

18  by Nurse McGrogan while I was at medical was a

19  finger monitor.  Now if you can monitor --

20  Q.         What else did you want her to do?

21  A.         Administer medication that I'm allowed to

22  have.

23  Q.         So you wanted medication?  That's what

24  you --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

61

1   A.          Correct.

2   Q.          I thought you came down there to be

3   examined and to be checked out to see what medical

4   needs you had?  Or did you just go down looking for

5   medication?

6   A.          As I stated before, I informed the block

7   officer that morning that I was having chest pains.

8   That's the only way that you can get off of the

9   block and considered an emergency.

10  Q.          Thank you.

11  A.          Thank you.

12                      MR. FERRANTE:  I don't have any

13          other questions for you.

14  BY MR. SHOTLAND:

15  Q.          Mr. Moore, just very briefly, was there

16  soap in your cell?

17  A.          I'm not sure whether there was soap in the

18  cell or not.

19  Q.          You don't know whether there was soap in

20  your cell?

21  A.          Yeah, because some days -- when soap is

22  handed out, some days you may go through a period of

23  two or three days without any soap before you get

24  your renewal.

TROY LAMONT MOORE, SR.

62

1    Q.        And you don't remember whether there was

2    soap in your cell?

3    A.        I don't remember.

4    Q.        But there was a sink in your cell?

5    A.        That is correct.

6    Q.        And after the toilet overflowed for the

7    first time, you went to the sink and you washed

8    yourself off as best as you could?

9    A.        I splashed water in my eyes and in my mouth

10   to get the raw sewage out of my face area.

11   Q.        Was there anything stopping you from

12   cleaning yourself off at the sink?

13   A.        The raw sewage that was spurting out of the

14   toilet.  The -- let me just give you an idea that --

15   the sink sits over top of the toilet.

16   Q.        The sink is directly over top of the

17   toilet?

18   A.        Not directly.  It's in the proximity over

19   the toilet.

20   Q.        And at times you said the toilet was

21   overflowing every 10 minutes, but within those 10

22   minute periods it was not overflowing, correct?

23   A.        Some there weren't, some there were.  Like

24   I said, when the cells above me would flush their

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TROY LAMONT MOORE, SR.

63

1    toilet within that 10 minute interval, our toilet

2    would overflow again.

3                    MR. SHOTLAND:  Thank you,

4            Mr. Moore.  That's all I have.

5                    (Witness excused.)

6                    (Deposition concluded at

7            3:44 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

TROY LAMONT MOORE, SR.

64

CERTIFICATION

I, ALEXANDRA ALVARADO, Court
Reporter, certify that the foregoing
is a true and accurate transcript of
the foregoing deposition, that the
witness was first sworn by me at the
time, place and on the date herein
before set forth.

I further certify that I am
neither attorney nor counsel for, not
related to nor employed by any of the
parties to the action in which this
deposition was taken; further, that I
am not a relative or employee of any
attorney or counsel employed in this
case, nor am I financially interested
in this action.

Alexandra Alvarado
Court Reporter
and Notary Public
Dated: FEB 03 2015

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES